# UNITED STATES *v.* SOCONY-VACUUM OIL CO., INC. ET AL.*

No. 346. Argued February 5, 6, 1940.—Decided May 6, 1940.

---

*Together with No. 347, *Socony-Vacuum Oil Co., Inc. et al.* v. *United States,* also on writ of certiorari (308 U. S. 540) to the Circuit Court of Appeals for the Seventh Circuit.

*Mr. John Henry Lewin* and *Assistant Attorney General Arnold,* with whom *Solicitor General Jackson* and *Messrs. Charles H. Weston* and *Grant W. Kelleher* were on the brief, for the United States.

156

158

*Mr. William J. Donovan,* with whom *Messrs. Ral-stone R. Irvine, Herbert H. Thomas, Harry S. Ridgely, Hiram E. Wooster, Louis Mead Treadwell, Goldthwaite H. Dorr, Charles A. Frueauff, Theodore W. Brazeau, Dan Moody, William H. Zwick, James J. Cosgrove,. Charles I.*

*Francis, Samuel A. Mitchell, Truman Post Young, Roy T. Osborn, Thomas T. Cooke, J. C. Denton, Rayburn L. Foster, W. P. Z. German, A. F. Molony, Ralph Horween,* and *Samuel Topliff* were on the brief, for respondents in No. 346 and petitioners in No. 347.

160

162

164

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondents [1] were convicted by a jury,[2] 23 F. Supp. 937, under an indictment charging violations of § 1 of the Sherman Anti-Trust Act,[3] 26 Stat. 209; 50 Stat. 693.

---

[1] The indictment charged 27 corporations and 56 individuals with violations of § 1 of the Sherman Law. There were brought to trial 26 corporations and 46 individuals. Prior to submission of the case to the jury the court discharged, directed verdicts of acquittal, or dismissed the indictment as to 10 of the corporations and 16 of the individuals. The jury returned verdicts of guilty as to the remaining 16 ·corporations and 30 individuals. Thereafter the trial court ordered new trials as to 3 ́corporations and 15 individuals and granted judgment *non obstante veredicto* to one other corporation and 10 other individuals. *United States* v. *Stone*, 308 U. S. 519. For the opinions of the District Court on that phase of the case, see 23 F. Supp. 937, 938–939; 24 F. Supp. 575; and for the opinion of the Circuit Court of Appeals, 101 F. 2d 870.

The respondents are the remaining 12 corporations and 5 individuals, viz., Socony-Vacuum Oil Company, Inc., Wadhams Oil Company, Empire Oil and Refining Company, Continental Oil Company, The Pure Oil Company, Shell Petroleum Corporation, Sinclair Refining Company, Mid-Continent Petroleum Corporation, Phillips Petroleum Company, Skelly Oil Company, The Globe Oil & Refining Company (Oklahoma), The Globe Oil & Refining Company (Illinois), C. E. Arnott, vice president of Socony-Vacuum, H. T. Ashton, manager of Lubrite Division of Socony-Vacuum, R. H. McElroy, Jr., tank-car sales manager of Pure Oil, P. E. Lakin, general manager of sales of Shell, R. W. McDowell, vice president in charge of sales of Mid-Continent.

[2] Each of the corporations was fined $5,000; each individual, $1,000.

[3] Sec. 1 provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: . . . Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

The Circuit Court of Appeals reversed and remanded for a new trial. 105 F. 2d 809. The case is here on a petition and cross-petition for certiorari, both of which we granted because of the public importance of the issues raised. 308 U. S. 540.

I. *The Indictment.*

The indictment was returned in December 1936 in the United States District Court for the Western District of Wisconsin. It charges that certain major oil companies,[4] selling gasoline in the Mid-Western area[5] (which includes the Western District of Wisconsin), (1) "combined and conspired together for the purpose of artificially raising and fixing the tank car prices of gasoline" in the "spot markets" in the East Texas[6] and Mid-Continent[7] fields; (2) "have artificially raised and fixed said spot market tank car prices of gasoline and have maintained said prices at artificially high and non-competitive levels, and at levels agreed upon among them and have thereby intentionally increased and fixed the tank car prices of gasoline contracted to be sold and sold in interstate commerce as aforesaid in the Mid-Western area"; (3) "have arbitrarily," by reason of the provisions of the prevailing form of jobber contracts which made the price to the jobber dependent on the average spot market price, "exacted large sums of money from thousands of jobbers with

---

[4] The major oil companies, in the main, engage in every branch of the business—owning and operating oil wells, pipe-lines, refineries, bulk storage plants, and service stations. Those engaging in all such branches are major integrated oil companies; those lacking facilities for one or more of those branches are semi-integrated. "Independent refiners" describes companies engaged exclusively in refining.

[5] Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, North Dakota, South Dakota, and Wisconsin.

[6] Located in the north, eastern part of Texas.

[7] Described as including Oklahoma, the northern and western portions of Texas, the southern and eastern portions of Kansas, the southern portion of Arkansas, the northern portion of Louisiana.

whom they have had such contracts in said Mid-Western area"; and (4) "in turn have intentionally raised the general level of retail prices prevailing in said Mid-Western area."

The *manner* and *means* of effectuating such conspiracy are alleged in substance as follows: Defendants, from February 1935 to December 1936 "have knowingly and unlawfully engaged and participated in two concerted gasoline buying programs" for the purchase "from independent refiners in spot transactions of large quantities of gasoline in the East Texas and Mid-Continent fields at uniform, high, and at times progressively increased prices." The East Texas buying program is alleged to have embraced purchases of gasoline in spot transactions from most of the independent refiners in the East Texas field, who were members of the East Texas Refiners' Marketing Association, formed in February 1935 with the knowledge and approval of some of the defendants "for the purpose of selling and facilitating the sale of gasoline to defendant major oil companies." It is alleged that arrangements were made and carried out for allotting orders for gasoline received from defendants among the members of that association; and that such purchases amounted to more than 50% of all gasoline produced by those independent refiners. The Mid-Continent buying program is alleged to have included "large and increased purchases of gasoline" by defendants from independent refiners located in the Mid-Continent fields pursuant to allotments among themselves. Those purchases, it is charged, were made from independent refiners who were assigned to certain of the defendants at monthly meetings of a group representing defendants. It is alleged that the purchases in this buying program amounted to nearly 50% of all gasoline sold by those independents. As respects both the East Texas and the Mid-Continent buying programs, it is alleged that the purchases of gasoline were in excess of the amounts which defendants would have

purchased but for those programs; that at the instance of certain defendants these independent refiners curtailed their production of gasoline.

The independent refiners selling in these programs were named as co-conspirators, but not as defendants.

Certain market journals—Chicago Journal of Commerce, Platt's Oilgram, National Petroleum News—were made defendants.[8] Their participation in the conspiracy is alleged as follows: that they have been "the chief agencies and instrumentalities" through which the wrongfully raised prices "have affected the prices paid by jobbers, retail dealers, and consumers for gasoline in the Mid-Western area," that they "knowingly published and circulated as such price quotations the wrongfully and artificially raised and fixed prices for gasoline paid by" defendants in these buying programs, while "representing the price quotations published by them" to be gasoline prices "prevailing in spot sales to jobbers in tank car lots" and while "knowing and intending them to be relied on as such by jobbers and to be made the basis of prices to jobbers."

*Jurisdiction* and *venue* in the Western District of Wisconsin are alleged as follows: that most of defendant major oil companies have sold large quantities of gasoline in tank car lots to jobbers in that district at the "artificially raised and fixed and non-competitive prices"; that they have "solicited and taken contracts and orders" for

---

[8] Two individuals connected with those journals were also made defendants. One of the individuals was not brought to trial. At the close of the government's case the indictment was dismissed, on motion of the government, as against the other four trade journal defendants.

gasoline in that district; and that they have required retail dealers and consumers therein "to pay artificially increased prices for gasoline" pursuant to the conspiracy.

*The methods of marketing and selling gasoline* in the Mid-Western area are set forth in the indictment in some detail. Since we hereafter develop the facts concerning them, it will suffice at this point to summarize them briefly. Each defendant major oil company owns, operates or leases retail service stations in this area. It supplies those stations, as well as independent retail stations, with gasoline from its bulk storage plants. All but one sell large quantities of gasoline to jobbers in tank car lots under term contracts. In this area these jobbers exceed 4,000 in number and distribute about 50% of all gasoline distributed to retail service stations therein, the bulk of the jobbers' purchases being made from the defendant companies. The price to the jobbers under those contracts with defendant companies is made dependent on the spot market price, pursuant to a formula hereinafter discussed. And the spot market tank car prices of gasoline directly and substantially influence the retail prices in the area. In sum, it is alleged that defendants by raising and fixing the tank car prices of gasoline in these spot markets could and did increase the tank car prices and the retail prices of gasoline sold in the Mid-Western area. The vulnerability of these spot markets to that type of manipulation or stabilization is emphasized by the allegation that spot market prices published in the journals were the result of spot sales made chiefly by independent refiners of a relatively small amount of the gasoline sold in that area—virtually all gasoline sold in tank car quantities in spot market transactions in the Mid-

Western area being sold by independent refiners, such sales amounting to less than 5% of all gasoline marketed therein.

So much for the indictment.

## II. *Background of the Alleged Conspiracy.*

Evidence was introduced (or respondents made offers of proof) showing or tending to show the following conditions preceding the commencement of the alleged conspiracy in February 1935. As we shall develop later, these facts were in the main relevant to certain defenses which respondents at the trial unsuccessfully sought to interpose to the indictment.

Beginning about 1926 there commenced a period of production of crude oil in such quantities as seriously to affect crude oil and gasoline markets throughout the United States. Overproduction was wasteful, reduced the productive capacity of the oil fields and drove the price of oil down to levels below the cost of production from pumping and stripper [9] wells. When the price falls below such cost, those wells must be abandoned. Once abandoned, subsurface changes make it difficult or impossible to bring those wells back into production. Since such wells constitute about 40% of the country's known oil reserves, conservation requires that the price of crude oil be maintained at a level which will permit such wells to be operated. As Oklahoma and Kansas were attempting to remedy the situation through their proration laws, the largest oil field in history was discovered in East Texas. That was in 1930. The supply of oil from this

[9] Described by one witness as "wells that have gotten down to less than 5 barrels a day, and in some cases down to less than a barrel a day, so that they only have to be pumped, sometimes, an hour or two a day to get all the oil they will produce at that stage of the game."

field was so great that at one time crude oil sank to 10 or 15 cents a barrel, and gasoline was sold in the East Texas field for 2⅛¢ a gallon. Enforcement by Texas of its proration law was extremely difficult. Orders restricting production were violated, the oil unlawfully produced being known as "hot oil" and the gasoline manufactured therefrom, "hot gasoline." Hot oil sold for substantially lower prices than those posted for legal oil. Hot gasoline therefore cost less and at times could be sold for less than it cost to manufacture legal gasoline. The latter, deprived of its normal outlets, had to be sold at distress prices. The condition of many independent refiners using legal crude oil was precarious. In spite of their unprofitable operations they could not afford to shut down, for if they did so they would be apt to lose their oil connections in the field and their regular customers. Having little storage capacity they had to sell their gasoline as fast as they made it. As a result their gasoline became "distress" gasoline—gasoline which the refiner could not store, for which he had no regular sales outlets and which therefore he had to sell for whatever price it would bring. Such sales drove the market down.

In the spring of 1933 conditions were acute. The wholesale market was below the cost of manufacture. As the market became flooded with cheap gasoline, gasoline was dumped at whatever price it would bring. On June 1, 1933, the price of crude oil was 25¢ a barrel; the tank car price of regular gasoline was 2⅝¢ a gallon. In June 1933 Congress passed the National Industrial Recovery Act (48 Stat. 195). Sec. 9 (c) of that Act authorized the President to forbid the interstate and foreign shipment of petroleum and its products produced or withdrawn from storage in violation of state laws. By Executive Order the President on July 11, 1933, forbade such shipments. On August 19, 1933, a code of fair competi-

tion for the petroleum industry was approved.[10] The Secretary of the Interior was designated as Administrator of that Code. He established a Petroleum Administrative Board to "advise with and make recommendations" to him. A Planning and Coordination Committee was appointed, of which respondent Charles E. Arnott, a vice-president of Socony-Vacuum, was a member, to aid in the administration of the Code. In addressing that Committee in the fall of 1933 the Administrator said: "Our task is to stabilize the oil industry upon a profitable basis." Considerable progress was made. The price of crude oil was a dollar a barrel near the end of September 1933, as a result of the voluntary action of the industry,[11] but, according to respondents, in accordance with the Administrator's policy and desire. In April 1934 an amendment to the Code was adopted under which an attempt was made to balance the supply of gasoline with the demand by allocating the amount of crude oil which each refiner could process with the view of creating a firmer condition in the market and thus increasing the

---

[10] It provided for maximum hours of work and minimum rates of pay; forbade sales below cost; required integrated companies to conduct each branch of their business on a profitable basis; established, within certain limits, the parity between the price of a barrel of crude oil and a gallon of refined gasoline as 18.5 to 1; and authorized the fixing of certain minimum prices.

[11] An order of the Administrator fixing minimum prices never became effective. Respondents also made an offer of proof that the Petroleum Administrative Board endeavored, in the fall of 1933, to obtain voluntary action by the larger companies to acquire and hold large stocks of crude oil, said to be overhanging the market and in danger of depressing the price of refined gasoline. The offer of proof indicated that some purchases had been made but did not show the extent. Respondents offered to show, through testimony of the chairman of the Planning & Coordination Committee, that it was the desire of the Administrator that crude oil not fall below $1 a barrel.

price of gasoline.[12] This amendment also authorized the Planning and Coordination Committee, with the approval of the President, to make suitable arrangements for the purchase of gasoline from non-integrated or semi-integrated refiners and the resale of the same through orderly channels. Thereafter four buying programs were approved by the Administrator.[13] These permitted the major companies to purchase distress gasoline from the independent refiners. Standard forms of contract were provided. The evil aimed at was, in part at least, the production of hot oil and hot gasoline. The contracts (to at least one of which the Administrator was a party) were made pursuant to the provisions of the National Industrial Recovery Act and the Code and bound the purchasing company to buy fixed amounts of gasoline at designated prices [14] on condition that the seller

[12] The testimony of one of respondents' witnesses was that this policy caused the major companies to buy gasoline—in the main from small, non-integrated refiners.

[13] June 23, 1934; August 13, 1934; September 8, 1934; November 2, 1934. They apparently were short-lived, their legality having been questioned by the Department of Justice. Late in 1933 the industry proposed the formation of a National Petroleum Agency, of which twenty-three of the larger companies, including most of the corporate respondents, were to be members, "to purchase, hold and, in an orderly way, dispose of surplus gasoline which threatens the stability of the oil price structure." Subscriptions for a pool of nearly $9,000,000 were obtained. The plan was never put into operation. In May 1934 there was another voluntary plan (which was abortive), the Planning & Coordination Committee addressed a resolution to certain major companies calling upon each to purchase an amount of gasoline in May equal to 3% of their sales.

[14] Under the November 2, 1934 program the contract provided that the price to be paid for the gasoline purchased should increase ¼¢ per gallon with each .5¢ per barrel increase in the posted price of crude oil and should decrease ¼¢ per gallon with each 5¢ per barrel decrease in crude.

should abide by the provisions of the Code. According to the 1935 Annual Report of the Secretary of the Interior, these buying programs were not successful as "the production of gasoline from 'hot oil' continued, stocks of gasoline mounted, wholesale prices for gasoline remained below parity with crude-oil prices, and in the early fall of 1934 the industry approached a serious collapse of the wholesale market." [15] Restoration of the price of gasoline to parity with crude oil at one dollar per barrel was not realized.

The flow of hot oil out of East Texas continued. Refiners in the field could procure such oil for 35¢ or less a barrel and manufacture gasoline from it for 2 or 2½¢ a gallon. This competition of the cheap hot gasoline drove the price of legal gasoline down below the cost of production. The problem of distress gasoline also persisted. The disparity between the price of gasoline and the cost of crude oil which had been at $1 per barrel since September 1933 caused losses to many independent refiners, no matter how efficient they were. In October 1934 the Administrator set up a Federal Tender Board and issued an order making it illegal to ship crude oil or gasoline out of East Texas in interstate or foreign commerce unless it were accompanied by a tender issued by that Board certifying that it had been legally produced or manufactured. Prices rose sharply. But the improvement was only temporary as the enforcement of § 9 (c) of the Act was enjoined in a number of suits. On January 7, 1935, this Court held § 9 (c) to be unconstitutional. *Panama Refining Co.* v. *Ryan*, 293 U. S. 388. Following that decision there was a renewed influx of hot gasoline into the Mid-Western area and the tank car market fell.

---

[15] P. 37. Excerpts from this report were part of an offer of proof by respondents.

Meanwhile the retail markets had been swept by a series of price wars. These price wars affected all markets—service station, tank wagon, and tank car. Early in 1934 the Petroleum Administrative Board tried to deal with them—by negotiating agreements between marketing companies and persuading individual companies to raise the price level for a period. On July 9, 1934, that Board asked respondent Arnott, chairman of the Planning and Coordination Committee's Marketing Committee,[16] if he would head up a voluntary, coöperative movement to deal with price wars. According to Arnott, he pointed out that in order to stabilize the retail market it was necessary to stabilize the tank car market through elimination of hot oil and distress gasoline.[17] On July 20, 1934, the Administrator wrote Arnott, described the disturbance caused by price wars and said:

"Under Article VII, Section 3 of the Code it is the duty of the Planning and Coordination Committee to coöperate with the Administration as a planning and fair practice agency for the industry. I am, therefore, requesting you, as Chairman of the Marketing Committee of the Planning and Coordination Committee, to take action which we deem necessary to restore markets to their normal conditions in areas where wasteful competition has caused them to become depressed. The number and extent of these situations would make it impractical for the Petroleum Administrative Board acting alone to deal with each specific situation. Therefore, I am re-

---

[16] The Marketing Committee had an extensive organization of regional, state, local, or temporary committees, scattered throughout the country and representative of the various marketing elements in the industry.

[17] He also testified that the Board said that it could not tell him how to deal with the price wars but that it would authorize him to deal with "the elements [of] that conflict that cause them."

questing and authorizing you, as Chairman of the Marketing Committee, to designate committees for each locality when and as price wars develop, with authority to confer and to negotiate and to hold due public hearings with a view to ascertaining the elements of conflict that are present, and in a cooperative manner to stabilize the price level to conform to that normally prevailing in contiguous areas where marketing conditions are similar. Any activities of your Committee must, of course, be consistent with the requirements of Clause 2 of Sub-section (a) of Section III of the Act, . . ." [18]

---

[18] Sec. 3 (a) of the Act read:

"Upon the application to the President by one or more trade or industrial associations or groups, the President may approve a code or codes of fair competition for the trade or industry or subdivision thereof, represented by the applicant or applicants, if the President finds (1) that such associations or groups impose no inequitable restrictions on admission to membership therein and are truly representative of such trades or industries or subdivisions thereof, and (2) that such code or codes are not designed to promote monopolies or to eliminate or oppress small enterprises and will not operate to discriminate against them, and will tend to effectuate the policy of this title: *Provided,* That such code or codes shall not permit monopolies or monopolistic practices: *Provided further,* That where such code or codes affect the services and welfare of persons engaged in other steps of the economic process, nothing in this section shall deprive such persons of the right to be heard prior to approval by the President of such code or codes. The President may, as a condition of his approval of any such code, impose such conditions (including requirements for the making of reports and the keeping of accounts) for the protection of consumers, competitors, employees, and others, and in furtherance of the public interest, and may provide such exceptions to and exemptions from the provisions of such code, as the President in his discretion deems necessary to effectuate the policy herein declared."

Section 5 provided:

"While this title is in effect (or in the case of a license, while section 4 (a) is in effect) and for sixty days thereafter, any code, agree-

After receiving that letter Arnott appointed a General Stabilization Committee with headquarters in Washington and a regional chairman in each region. Over fifty state and local committees were set up. The Petroleum Administrative Board worked closely with Arnott and the committees until the end of the Code near the middle of 1935. The effort (first local, then state-wide, and finally regional) was to eliminate price wars by negotiation and by persuading suppliers to see to it that those who bought from them sold at a fair price. In the first week of December 1934, Arnott held a meeting of the General Stabilization Committee in Chicago and a series of meetings on the next four or five days attended by hundreds of members of the industry from the middle west. These meetings were said to have been highly successful in elimination of many price wars. Arnott reported the results to members of the Petroleum Administrative Board on December 18, 1934, and stated that he was going to have a follow-up meeting in the near future. It was at that next meeting that the groundwork for the alleged conspiracy was laid.

III. *The Alleged Conspiracy.*

The alleged conspiracy is not to be found in any formal contract or agreement. It is to be pieced together from the testimony of many witnesses and the contents of over 1,000 exhibits, extending through the 3,900 printed pages of the record. What follows is based almost entirely on unequivocal testimony or undisputed contents of exhibits, only occasionally on the irresistible inferences from those facts.

ment, or license approved, prescribed, or issued and in effect under this title, and any action complying with the provisions thereof taken during such period, shall be exempt from the provisions of the anti-trust laws of the United States."

## A. FORMATION OF THE MID-CONTINENT BUYING PROGRAM.

The next meeting of the General Stabilization Committee was held in Chicago on January 4, 1935, and was attended by all of the individual respondents, by representatives of the corporate respondents, and by others. Representatives of independent refiners, present at the meeting, complained of the failure of the price of refined gasoline to reach a parity with the crude oil price of $1 a barrel. And complaints by the independents of the depressing effect on the market of hot and distress gasoline were reported. Views were expressed to the effect that "if we were going to have general stabilization in retail markets, we must have some sort of a firm market in the tank car market." As a result of the discussion Arnott appointed a Tank Car Stabilization Committee [19] to study the situation and make a report, or, to use the language of one of those present, "to consider ways and means of establishing and maintaining an active and strong tank car market on gasoline." Three days after this committee was appointed, this Court decided *Panama Refining Co.* v. *Ryan, supra.* As we have said, there was evidence that following that decision there was a renewed influx of hot gasoline into the Mid-Western area with a consequent falling off of the tank car market prices.

The first meeting of the Tank Car Committee was held February 5, 1935, and the second on February 11, 1935. At these meetings the alleged conspiracy was formed, the substance of which, so far as it pertained to the Mid-Continent phase, was as follows:

It was estimated that there would be between 600 and 700 tank cars of distress gasoline produced in the Mid-

---

[19] This committee eventually was composed of respondents Mc-Dowell, Ashton and Lakin and five former defendants, who were either discharged or granted new trials.

Continent oil field every month by about 17 independent. refiners. These refiners, not having regular outlets for the gasoline, would be unable to dispose of it except at distress prices. Accordingly, it was proposed and decided that certain major companies (including the corporate respondents) would purchase gasoline from these refiners. The Committee would assemble each month information as to the quantity and location of this distress gasoline. Each of the major companies was to select one (or more) of the independent refiners having distress gasoline as its "dancing partner," [20] and would assume responsibility for purchasing its distress supply. In this manner buying power would be coördinated, purchases would be effectively placed, and the results would be much superior to the previous haphazard purchasing. There were to be no formal contractual commitments to purchase this gasoline, either between the major companies or between the majors and the independents. Rather it was an informal gentlemen's agreement or understanding whereby each undertook to perform his share of the joint undertaking.

[20] Respondent R. W. McDowell, a vice president of Mid-Continent, testified as follows respecting the origin and meaning of this term:

"The phrase 'dancing partners' came up right there after Mr. Ashton had gone around the room. There were these 7 or 8 small refiners whom no one had mentioned. He said this situation reminded him of the dances that he used to go to when he was a young fellow. He said, 'Here we are at a great economic ball.' He said, 'We have these major companies who have to buy gasoline and are buying gasoline, and they are the strong dancers.' And he said, 'They have asked certain people to dance with them. They are the better known independent refiners.' He said, 'Here are 7 or 8 that no one seems to know.' He said, 'They remind me of the wallflowers that always used to be present at those old country dances.' He said, 'I think it is going to be one of the jobs of this Committee to introduce some of these wallflowers to some of the strong dancers, so that everybody can dance.' And from that simile, or whatever you want to call it, the term 'dancing partner' arose."

Purchases were to be made at the "fair going market price."

A Mechanical Sub-Committee [21] was appointed to find purchasers for any new distress gasoline which might appear between the monthly meetings of the Tank Car Stabilization Committee and to handle detailed problems arising during these periods. It was agreed that any such attempt to stabilize the tank car market was hopeless until the flow of hot gasoline was stopped. But it was expected that a bill pending before Congress to prohibit interstate shipment of hot gasoline would soon be enacted which would deal effectively with that problem. Accordingly, it was decided not to put any program into operation until this bill had been enacted and became operative. It was left to respondent Arnott to give the signal for putting the program into operation after this had occurred.

The Connally Act (49 Stat. 30) became law on February 22, 1935. The enforcement agency under this Act was the Federal Tender Board which was appointed about March 1st. It issued its first tenders March 4th. On March 1st respondents Arnott and Ashton explained the buying program to a group of Mid-Continent independent refiners in Kansas City, who expressed a desire to coöperate and who appointed a committee to attend a meeting of the Tank Car Stabilization Committee in St. Louis on March 5th to learn more about the details. This meeting was held with the committee of the independents present at one of the sessions. At a later session that day the final details of the Mid-Continent buying program were worked out, including an assignment

---

[21] This was a committee of three of which respondent McDowell was chairman.

of the "dancing partners" among the major companies.[22] On March 6th Ashton telephoned Arnott and told him what had been accomplished at the St. Louis meeting. Later the same day Arnott told Ashton by telephone that the program should be put into operation as soon as possible, since the Federal Tender Board seemed to be cleaning up the hot oil situation in East Texas. Ashton advised McDowell, chairman of the Mechanical Sub-Committee, of Arnott's instructions. And on March 7th that committee went into action. They divided up the major companies; each communicated with those on his list, advised them that the program was launched, and suggested that they get in touch with their respective "dancing partners." Before the month was out all companies alleged to have participated in the program (except one or two) made purchases; 757 tank cars were bought from all but three of the independent refiners who were named in the indictment as sellers.

B. THE MID-CONTINENT BUYING PROGRAM IN OPERATION.

No specific term for the buying program was decided upon, beyond the first month. But it was started with the hope of its continuance from month to month. And in fact it did go on for over a year, as we shall see.

The concerted action under this program took the following form:

The Tank Car Stabilization Committee had A. V. Bourque, Secretary of the Western Petroleum Refiners'

---

[22] The list of the independent refiners having the distress gasoline was read and the majors made their selections—some on the basis of prior business dealings, some on the basis of personal friendships, some because of location, freight advantages, etc.

Association,[23] make a monthly survey, showing the amount of distress gasoline which each independent refiner would have during the month. From March 1935 through February 1936 that Committee met once a month. At these meetings the surveys showing the amount and location of distress gasoline were presented and discussed. They usually revealed that from 600 to 800 tank cars of distress gasoline would become available during the month. Each member of the Committee present would indicate how much his company would buy and from whom. Those companies which were not represented at the meetings were approached by the Mechanical Sub-Committee; "word was gotten to them as to the amount of gasoline that it was felt they could take in that month." Also, as we have stated, the Mechanical Sub-Committee would endeavor to find purchasers for any new distress gasoline which appeared between the meetings of the Tank Car Stabilization Committee. It would report such new surpluses to Bourque. The functions of the Mechanical Sub-Committee were apparently not restricted merely to dissemination of information to the buyers. One of its members testified that he urged the majors to buy more distress gasoline. Throughout, persuasion was apparently used to the end that all distress gasoline would be taken by the majors and so kept from the tank car markets. As the program progressed, most of the major companies continued to buy from the same "dancing partners" with whom they had started.

One of the tasks of the Mechanical Sub-Committee was to keep itself informed as to the current prices of

[23] Practically all of the independent refiners named in the indictment were members of this Association. C. M. Boggs, the president of the Association, and A. V. Bourque, its secretary, were named in the indictment as defendants. As to the former, a motion for directed verdict of acquittal was granted; as to the latter, the verdict of the jury was set aside and the indictment dismissed.

gasoline and to use its persuasion and influence to see to it that the majors paid a fair going market price and did not "chisel" on the small refiners. It did so. At its meetings during the spring of 1935 the question of the fair going market price was discussed. For example, Jacobi, a member of the Sub-Committee, testified that at the meeting of March 14, 1935, "the subcommittee . . . arrived at what we thought was a fair market price for the week following," viz. $3\frac{3}{4}\text{¢}$ and $4\frac{3}{4}\text{¢}$.[24] Jacobi termed these prices arrived at by the Sub-Committee as the "recommended prices." He made it a practice of recommending these prices to the major companies with which he communicated. According to his testimony, those "recommendations" were represented by him to be not the Sub-Committee's but his own idea. McDowell testified that he never made any such price recommendations but if asked would tell the purchasing companies what his own company was paying for gasoline.[25] Up to June 7, 1935, price "recommendations" were made five or seven times, each time the "recommended" prices constituting a price advance of $\frac{1}{8}\text{¢}$ or $\frac{1}{4}\text{¢}$ over the previous "recommendation." No more price "recommendations" were made in 1935. In January 1936 there was an advance in the price of crude oil. The members of the Sub-Committee discussed the price situation and concluded that an advance of $\frac{1}{2}\text{¢}$ a gallon of gasoline purchased under the program should be made. Jacobi made that "recommendation" to the companies on his list.

[24] On March 15, 1935, Jacobi in a letter to his superiors wrote: "The writer has been busy this week on tank car stabilization work, and thus far results are gratifying. Our Committee decided on a price of $3\frac{3}{4}\text{¢}$ for third grade, and $4\frac{3}{4}\text{¢}$ for 'Q,' for next week. Purchasing companies, including our own units, are paying these prices today." "Q" gasoline is regular gasoline with an octane rating of 68–70.

[25] What the practice of the other member of the Mechanical Sub-Committee was in this respect does not appear.

184 

We shall discuss later the effect of this buying program on the market.

The major companies regularly reported to Bourque, the trade association representative of the Mid-Continent independent refiners, the volume of their purchases under the program and the prices paid. Representatives of one of the corporate respondents repeatedly characterized its purchases under the program as "quotas," "obligations," or "allocations." They spoke of one of its "dancing partners" under the buying program as "one of the babies placed in our lap last spring when this thing was inaugurated." And they stated that "we don't have much choice as to whose material we are to take, when we purchase outside third grade gasoline in connection with the Buying Program Committee's operations. On such purchases, we have refineries 'assigned' to us." This was doubtless laymen's, not lawyers', language. As we have said, there does not appear to have been any binding commitment to purchase; the plan was wholly voluntary; there is nothing in the record to indicate that a participant would be penalized for failure to coöperate. But though the arrangement was informal, it was nonetheless effective, as we shall see. And, as stated by the Circuit Court of Appeals, there did appear to be at least a moral obligation to purchase the amounts specified at the fair market prices "recommended." That alone would seem to explain why some of the major companies cancelled or declined to enter into profitable deals for the exchange of gasoline with other companies in order to participate in this buying program. Respondent Skelly Oil Co. apparently lost at least some of its pipe-line transportation profit of $\frac{3}{16}\cent$ a gallon "on every car of gasoline" purchased by it in the buying program. And both that company and respondent Wadhams Oil Co. continued to make purchases of gasoline under the program although they were unable then to dispose of it.

Up to June 1935, the expenses incurred by the members of the Mechanical Sub-Committee were charged to and paid by the Planning and Coordination Committee of the Code of Fair Competition for the Petroleum Industry. On May 27, 1935, this Court held in *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, that the code-making authority conferred by the National Industrial Recovery Act was an unconstitutional delegation of legislative power. Shortly thereafter the Tank Car Stabilization Committee held a meeting to discuss their future course of action. It was decided that the buying program should continue. Accordingly, that Committee continued to meet each month through February 1936. The procedure at these meetings was essentially the same as at the earlier ones. Gradually the buying program worked almost automatically, as contacts between buyer and seller became well established. The Mechanical Sub-Committee met at irregular intervals until December 1935. Thereafter it conducted its work on the telephone.

C. FORMATION AND NATURE OF THE EAST TEXAS BUYING PROGRAM.

In the meetings when the Mid-Continent buying program was being formulated it was recognized that it would be necessary or desirable to take the East Texas surplus gasoline off the market so that it would not be a "disturbing influence in the Standard of Indiana territory." The reason was that weakness in East Texas spot market prices might make East Texas gasoline competitive with Mid-Continent gasoline in the Mid-Western area and thus affect Mid-Continent spot market prices. The tank car rate on gasoline shipments from the East Texas field to points in the Mid-Western area was about 1/8¢ a gallon higher than from the Mid-Continent field. With East Texas spot market prices more than 1/8¢ a

gallon below Mid-Continent spot market prices, there might well be a resulting depressing effect on the Mid-Continent spot market prices.[26]

Early in 1935 the East Texas Refiners' Marketing Association was formed to dispose of the surplus gasoline manufactured by the East Texas refiners. The occasion for the formation of this Association was the stoppage of the shipment of hot oil and gasoline as a consequence of a Texas law enacted in December 1934. As long as these refiners had operated on cheap hot oil they had been able to compete for business throughout the Middle West. If they used legal crude at a dollar a barrel, their costs would increase. Their shift from a hot oil to a legal oil basis necessitated a change in their marketing methods. They were already supplying jobbers and dealers of Texas with all the gasoline they could use. Hence, their problem was to find additional markets for the surplus gasoline which they manufactured from legal crude. The Association was to act as the sales agency for those surpluses. Shipments north would be against the freight differential. Therefore, without regular outlets for this surplus gasoline they would have been forced to dump it on the market at distress prices. Their plan was to persuade the major companies if possible to buy more East Texas gasoline and to purchase it through the Association which would allocate it among its members who had surpluses. Neil Buckley, a buyer for Cities Service

---

[26] Arnott was reported as saying: "East Texas has been a menace to not only the Eastern Seaboard, but its gasoline also has found its way up into the Mid-Continent and has been competitive with the so-called Mid-Continent suppliers' or refiners' gasoline."

The normal market for gasoline refined in East Texas was the State of Texas and the Atlantic Seaboard, reached through tanker shipments from Gulf ports.

Export Corporation in Tulsa, was recommended by one of the independents as the contact man. Buckley undertook the job.[27]

Thus it was not established that the major companies caused the Association to be formed. But it is clear that the services of the Association were utilized in connection with a buying program by defendant companies. The record is quite voluminous on the activities of Buckley in getting the support of the majors to the Association's program. Suffice it to say that he encountered many difficulties, most of them due to the suspicion and mistrust of the majors as a result of the earlier hot oil record of the East Texas independents. His initial task was to convince the majors of the good faith of the East Texas independents. Many conferences were had. Arnott gave help to Buckley. Thus, on March 1, 1935, Arnott wired a small group of representatives of major companies, who were buyers and users of East Texas gasoline, inviting them to attend a meeting in New York City on March 6th "to hear outcome my meeting with East Texas refiners and to consider future action surplus gasoline this and other groups that is awaiting our decision . . . matter of extreme importance." The problem was discussed at that meeting [28] but reliable information was lacking as to the probable amount of distress gasoline, the size of the independents' federal allocations and whether or not such gasoline was going to be manufactured within

---

[27] Buckley first secured the approval of his employer. His company, not the Association, paid his salary while he was engaged in this work; the Association paid his travel and telephone expenses.

[28] Representatives of respondents Socony-Vacuum, Pure Oil, Sinclair and probably of Shell were present as well as representatives of other majors. The only individual respondents present were Arnott and McElroy.

188

those allocations. Accordingly Arnott appointed a committee to attend the meeting of the District Allocators [20] on March 13th and to obtain the information. That information was obtained and a schedule was prepared showing the probable amount of surplus gasoline in East Texas and the Gulf, the names of the regular buyers in those areas, and the amounts they might take. Arnott, on March 14th, by telegraph called another meeting in New York City for the next day, saying "The question of surplus gasoline which has been under consideration must be finalized tomorrow." At that meeting someone (apparently a representative of respondent Sinclair) "arose with a slip of paper in his hand and stated that it had been suggested" that each of 12 to 15 major companies "take so much gasoline" from East Texas, "the amounts being read off as to what each company would take." Nothing definite was decided at the meeting. Buckley continued his efforts, talking with Arnott and representatives of other majors. It is impossible to find from the record the exact point of crystallization of a buying program. But it is clear that as a result of Buckley's and Arnott's efforts and of the discussions at the various meetings various major companies did come into line and that a concerted buying program was launched. The correspondence of employees of some of the majors throughout the period in question is replete with references such as the following: "buying program in East Texas"; "our allocation of five cars per day"; "a general buying movement"; "regular weekly purchases from the East Texas group"; "allocations and purchases" in the East Texas field; and the like.

[20] They were part of the organization of the Planning & Coordination Committee under the Code. As to allocations under the Code see *infra*, pp. 201 *et seq*.

In 1935 the East Texas refiners named in the indictment sold 285,592,188 gallons of gasoline. Of this certain defendant companies[30] bought 40,195,754 gallons or 14.07%. In the same year all independent refiners in East Texas sold 378,920,346 gallons—practically all of it on the spot market. Of this amount those defendant companies purchased 12.03% or 45,598,453 gallons. Of the 8,797 tank cars purchased by all defendants (except Sinclair) from March 1935 through April 1936 from independent refiners in the East Texas field, 2,412 tank cars were purchased by the present corporate respondents.

Every Monday morning the secretary of the East Texas association ascertained from each member the amount of his forthcoming weekly surplus gasoline and the price he wanted. He used the consensus of opinion as the asking price. He would call the major companies; they would call him. He exchanged market information with them. Orders received for less than the asking price would not be handled by the Association; rather the secretary would refer the buyer to one of the independents who might sell at the lower price. Very few cars were purchased through the Association by others than the major oil companies.[31] The majors bought about 7,000 tank cars through the Asssociation in 1935 and about 2,700 tank cars in the first four months of 1936. And in 1935 the secretary of the Association placed an additional 1,000 tank cars by bringing the purchasers and the independent refiners together. The purchases in 1935 in East Texas were, with minor exceptions, either

[30] Not including, *inter alia,* Cities Service Export Oil Co., Louisiana Oil Refining Corp., Tide Water Assoc. Oil Co., The Texas Co., and Gulf Refining Co., as respects which the indictment had been dismissed.

[31] Only three of the corporate respondents purchased through the Association.

at the low or slightly below the low quotation in Platt's Oilgram, following it closely as the market rose in March, April, and May, 1935; they conformed to the market as it flattened out into more or less of a plateau through the balance of 1935 with a low for third grade gasoline of 4⅝¢. This was consistent with the policy of the buying program. For the majors were requested to purchase at the "fair, going market price." [32] And it is clear that this East Texas buying program was, as we have said, supplementary or auxiliary to the Mid-Continent program. As stated in March 1935 in an inter-company memorandum of one of the majors: ". . . with east coast refiners having a program to purchase surplus East Texas gasoline over the next four months, we feel that still further advances can be made in the tank car market and a resultant increase in the service station price."

### D. SCOPE AND PURPOSE OF THE ALLEGED CONSPIRACY.

As a result of these buying programs it was hoped and intended that both the tank car and the retail markets would improve. The conclusion is irresistible that defendants' purpose was not merely to raise the spot market prices but, as the real and ultimate end, to raise the price of gasoline in their sales to jobbers and consumers in the Mid-Western area. Their agreement or plan embraced not only buying on the spot markets but also, at least by clear implication, an understanding to maintain such improvements in Mid-Western prices as would result from those purchases of distress gasoline. The latter obviously would be achieved by selling at the increased prices, not

---

[32] An inter-company communication between employees of respondent Pure Oil written in May 1935 stated: "Prices were advanced this week in both regions to 4½¢ and 4⅝¢–5⅝¢, in view of some of the refiners squawking because our buying was considerably lower than the publications."

by price cutting. Any other understanding would have been wholly inconsistent with and contrary to the philosophy of the broad stabilization efforts which were under way. In essence the raising and maintenance of the spot market prices were but the means adopted for raising and maintaining prices to jobbers and consumers. The broad sweep of the agreement was indicated by Arnott before a group of the industry on March 13, 1935. He described the plan as one "whereby this whole stabilization effort of markets, the holding up of normal sales market structures, the question of the realization of refineries, the working together of those two great groups in order that we may balance this whole picture and in order that we may interest a great many buyers in this so-called surplus or homeless gasoline, can be done along organized lines. . . ." Certainly there was enough evidence to support a finding by the jury that such were the scope and purpose of the plan.

But there was no substantial competent evidence that defendants, as charged in the indictment, induced the independent refiners to curtail their production.

### E. MARKETING AND DISTRIBUTION METHODS.

Before discussing the effect of these buying programs, some description of the methods of marketing and distributing gasoline in the Mid-Western area during the indictment period is necessary.

The defendant companies sold about 83% of all gasoline sold in the Mid-Western area during 1935. As we have noted, major companies, such as most of the defendants, are those whose operations are fully integrated—producing crude oil, having pipe lines for shipment of the crude to its refineries, refining crude oil, and marketing gasoline at retail and at wholesale. During the greater part of the indictment period the defendant companies

owned and operated many retail service stations [33] through which they sold about 20% of their Mid-Western gasoline in 1935 and about 12% during the first seven months of 1936. Standard Oil Company (Indiana) [34] was known during this period as the price leader or market leader throughout the Mid-Western area. It was customary for retail distributors, whether independent or owned or controlled by major companies, to follow Standard's posted retail prices. Its posted retail price in any given place in the Mid-Western area was determined by computing the Mid-Continent spot market price and adding thereto the tank car freight rate from the Mid-Continent field, taxes and 5½¢. The 5½¢ was the equivalent of the customary 2¢ jobber margin and 3½¢ service station margin. In this manner the retail price structure throughout the Mid-Western area during the indictment period was based in the main on Mid-Continent spot market quotations,[35] or, as stated by one of the witnesses for the defendants, the spot market was a "peg to hang the price structure on."

About 24% of defendant companies' sales in the Mid-Western area in 1935 were to jobbers, who perform the function of middlemen or wholesalers. Since 1925 jobbers were purchasing less of their gasoline on the spot tank car markets and more under long term supply contracts from major companies and independent refiners. These contracts usually ran for a year or more and covered all of the jobber's gasoline requirements during the period. The price which the jobber was to pay over the life of the contract was not fixed; but a formula for its com-

[33] It appears that, beginning in 1935 and increasing in the latter part of 1936, state chain store legislation resulted in the majors leasing many of their retail service stations.

[34] A defendant to whom a new trial was granted.

[35] Further details of Standard's policy in posting retail prices are discussed, p. 198.

putation was included. About 80% or more of defendant companies' jobber contracts provided that the price of gasoline sold thereunder should be the Mid-Continent spot market price on the date of shipment. This spot market price was to be determined by averaging the high and low spot market quotations reported in the Chicago Journal of Commerce and Platt's Oilgram or by averaging the high and low quotations reported in the Journal alone. The contracts also gave the jobber a wholly or partially guaranteed margin between the price he had to pay for the gasoline and the normal price to service stations—customarily a 2¢ margin.[36]

There is no central exchange or market place for spot market transactions. Each sale is the result of individual bargaining between a refiner and his customers, sales under long-term contracts not being included. It is a "spot" market because shipment is to be made in the immediate future—usually within ten or fifteen days. Sales on the spot tank car markets are either sales to jobbers or consumers, sales by one refiner to another not being included.[37] The prices paid by jobbers and consumers in the various spot markets are published daily

---

[36] The following is illustrative: The spot market price (computed as indicated) was to govern when that price plus freight, plus 5½¢ per gallon did not exceed the posted service station price, exclusive of tax, at destination on date of shipment. In case that aggregate figure exceeded the service station price, then the price to the jobber would be reduced by an amount equal to one-half of the excess. In some cases the major companies assumed the full amount of the difference. The margin of 5½¢ was based on the seller's discount of 3½¢ to jobbers. Hence if the seller increased or decreased that discount generally then the margin of 5½¢ would be increased or decreased by an equal or like amount. The wording of the various contracts varied but there was great uniformity in principle.

[37] For this reason "spot open market" is frequently used, "open" market referring to sales which are not made on contract nor based on future publications.

in the trade journals, Platt's Oilgram and Chicago Journal of Commerce. In the case of the Oilgram these prices are obtained by a market checker who daily calls refiners in the various refinery areas (major companies as well as independents) and ascertains the quantity and price of gasoline which they have sold *to jobbers* in spot sales.[38] After checking the prices so obtained against other sources of information (such as brokers' sales) and after considering the volume of sales reported at each price, he determines the lowest and highest prices at which gasoline is being sold *to jobbers* in substantial quantities on the spot market.[39] Thus, if he finds that substantial sales are reported at $5\frac{1}{8}$¢, $5\frac{1}{4}$¢ and $5\frac{3}{8}$¢, the Oilgram reports a price range of $5\frac{1}{8}$–$5\frac{3}{8}$¢. The result is published in the Oilgram that same day.[40] The Chicago Journal of Commerce publishes similar quotations the day after the sales are reported. And its quotations cover sales to industrial consumers as well as to jobbers. But it was not shown that either journal had published prices paid by a major company as a price paid by jobbers on the tank car market.

F. THE SPOT MARKET PRICES DURING THE BUYING PROGRAM.

In 1935 the 14 independent Mid-Continent refiners named in the indictment sold 377,988,736 gallons of gasoline. Of that output, the corporate respondents pur-

---

[38] In case actual sales cannot be obtained, he gets the prices at which the refiners will sell to jobbers in that open spot market.

[39] Major companies sell little gasoline to jobbers on a spot basis. The spot market prices published in the trade journals are based largely on sales by independent refiners.

[40] The National Petroleum News gives the Oilgram quotations in weekly form.

chased about 56,200,000 gallons or approximately 15% [41] and the defendant companies who went to trial, about 17%. The monthly purchases of all defendant companies from Mid-Continent independents from March 1935 to April 1936 usually ranged between 600 and 900 tank cars and in a few months somewhat exceeded those amounts.

Major company buying began under the Mid-Continent program on March 7, 1935. During the week before that buying commenced the Mid-Continent spot market for third grade gasoline rose ⅜¢. The low quotation on third grade gasoline was 3½¢ on March 6, 1935. It rose to 4¾¢ early in June. That advance was evidenced by ten successive steps. The market on third grade gasoline then levelled out on a plateau which extended into January 1936, except for a temporary decline in the low quotation late in 1935. By the middle of January the low again had risen, this time to 5¼¢. It held substantially at that point until the middle of February 1936. By the end of February it had dropped to 5¢. It then levelled off at that low and remained there into May 1936 when the low dropped first to 4⅞¢ and then to 4¾¢. It stayed there until the first week in July 1936. The low then rose to 4⅞¢, maintained that level until mid-August, then started to drop until by successive steps it had declined to 4½¢ before the middle of September. It stayed there

---

[41] That percentage is apparently reduced to about 10.5% if sales of 29 independent refiners (including the 14 named in the indictment) are taken.

What percentage these purchases by respondents were of the Mid-Continent spot market in 1935 does not clearly appear, the government's estimate of one-third to a half apparently being somewhat high.

until early October when it rose to $4\frac{5}{8}\cent$, continuing at that level until middle November when it rose to $4\frac{3}{4}\cent$. The low remained at substantially that point throughout the balance of 1936.

During 1935, as the Mid-Continent spot market for third grade gasoline was rising, so was the East Texas spot market. And when in June 1935 the former levelled off for the balance of the year at a low of $4\frac{3}{4}\cent$, the latter [42] levelled off, as we have seen, at a low of $4\frac{5}{8}\cent$.

During this period there were comparable movements on the Mid-Continent spot market for regular gasoline. From a low of $4\frac{3}{8}\cent$ on March 7, 1935, it rose to a low of $5\frac{5}{8}\cent$ early in June, that advance being evidenced by nine successive steps. As in the case of third grade gasoline, the market for regular gasoline then levelled out on a plateau which extended into January 1936. By the middle of January the low had risen to $6\frac{1}{8}\cent$. It held at that point until the middle of February 1936. By the end of February it had dropped to $5\frac{7}{8}\cent$. It rose to $6\cent$ in the first week of March, levelled off at that low and remained there into August 1936. By mid-August it started to drop—reaching $5\frac{1}{2}\cent$ in September, going to $5\frac{5}{8}\cent$ in October and to $5\frac{3}{4}\cent$ in November, where it stayed through the balance of 1936.

These plateaus are clearly shown by a chart of the market journals' quotations. But that does not of course mean that all sales on the spot market were made between the high and the low during the period in question. As we have said, the quotations of the market journals merely indicated the range of prices (usually an eighth) within which the bulk of the gasoline was being sold. Hence actual sales took place above the high and below

---

[42] Comparable movements took place in the East Texas spot market for regular gasoline until April 21, 1935, when those quotations were discontinued.

the low. Thus between June and December 1935 while the low for third grade gasoline remained substantially at 4¾¢ and the high at 4⅞¢ jobbers' and consumers' purchases[43] ranged from 4⅜¢ to 5⅛¢. A similar condition existed as respects regular gasoline.

Purchases by the major companies likewise did not always fall within the range of these quotations. In fact, between 85 and 90% of their purchases from the independent refiners were made at prices which were at or below the low quotations in the market journals.[44]

---

[43] Respondents computed that for 1935 8% of these purchases of third grade gasoline were above the high; 10% were at the high; 7% were between the high and low; 16% were below the low.

[44] Respondents' computations comparing their tabulations with the government's tabulations are as follows:

| Price Group | Government's | | Respondents' | |
|---|---|---|---|---|
| | Tank-Cars | % | Tank-Cars | % |
| Above the lowest quotations in Platt's Oilgram__ | 745 | 8.09 | 516 | 7.5 |
| Above the lowest quotations in Chicago Journal of Commerce_____ | 984 | 10.7 | 992 | 14.3 |
| At the lowest quotations in Platt's Oilgram_____ | 6,407 | 69.64 | 4,491½ | 64.9 |
| At the lowest quotations in Chicago Journal of Commerce_____ | 6,564 | 71.31 | 4,419⅔ | 63.9 |
| Below the lowest quotations in Platt's Oilgram___ | 2,052 | 22.27 | 1,912⅔ | 27.6 |
| Below the lowest quotations in Chicago Journal of Commerce_____ | 1,656 | 17.99 | 1,508⅔ | 21.8 |
| Total_____ | 9,204 | 100.00 | 6,920⅔ | 100. |

The government's tabulations dealt with 9,204 tank cars which defendants (excluding Sinclair) purchased on a flat price basis from independent refiners in the Mid-Continent field between March 1, 1935 and April 30, 1936. Respondents' tabulations included Sinclair and excluded sales by defendants who had already been dismissed, and eliminated or reclassified alleged omissions or improper classifications by the government.

Respondents' computations also show that the percentage of purchases at prices below the low quotations was higher during the

There were few such purchases above the high and not a substantial percentage at the high.[45]

### G. JOBBER AND RETAIL PRICES DURING THE BUYING PROGRAMS.

That the spot market prices controlled prices of gasoline sold by the majors to the jobbers in the Mid-Western area during the indictment period is beyond question. For, as we have seen, the vast majority of jobbers' supply contracts during that period contained price formulae which were directly dependent on the Mid-Continent spot market prices.[46] Hence, as the latter rose, the prices to the jobbers under those contracts increased.

There was also ample evidence that the spot market prices substantially affected the retail prices in the Mid-Western area during the indictment period. As we have seen, Standard of Indiana was known during this period as the price or market leader throughout this area. It was customary for the retailers to follow Standard's posted retail prices, which had as their original base the Mid-Continent spot market price. Standard's policy was

---

March–May, 1935 price rise than during the indictment period as a whole, and that the percentage of purchases above the low was lower during that period of price rise than during the period as a whole.

[45] Respondents' figures were: .7% above the high of the Journal; .8% above the high of the Oilgram; 3.7% at the high of the Journal; 6.1% at the high of the Oilgram. Apparently all purchases above the high were purchases of third grade, not regular gasoline.

[46] One government witness testified that out of 1,729 contracts made by the defendant major oil companies with jobbers in the Mid-Western area during 1935, 1,461 provided that the basic price was to be determined "on the basis of the average of the averages of the high and low quotations of the Chicago Journal of Commerce and Platt's Oilgram on spot market tank car gasoline." During 1935 defendant companies sold over 900,000,000 gallons to jobbers in the Mid-Western area out of total sales by them in that area of over 4,000,000,000 gallons.

to make changes in its posted retail price only when the spot market base went up or down at least $\frac{3}{10}\cancel{c}$ a gallon and maintained that change for a period of 7 days or more.[47] Standard's net reduction in posted prices for the 6 months preceding March 1935 was 1.9¢ per gallon. From March 1935 to June 1935 its posted retail prices were advanced $\frac{3}{10}\cancel{c}$ four times.

Retail prices in the Mid-Western area kept close step with Mid-Continent spot market prices during 1935 and 1936, though there was a short lag between advances in the spot market prices and the consequent rises in retail prices.[48] This was true in general both of the subnor-

---

[47] These changes were apparently not made automatically, as the factor of competition was taken into consideration.

[48] A comparison of Monday low quotations for house brand gasoline (Oklahoma market) with average service station prices for Standard's regular grade gasoline (less taxes) for 28 cities (including La Crosse and Milwaukee, Wis.) in the Mid-Western area shows the latter following the former upward from March to June 1935 and in January 1936.

| | Oklahoma | Service Station |
|---|---|---|
| March 4, 1935 | 4.375¢ | 12.56¢ |
| March 11, 1935 | 4.625 | 12.56 |
| March 18, 1935 | 4.750 | 12.56 |
| March 25, 1935 | 4.750 | 12.90 |
| April 1, 1935 | 4.875 | 12.90 |
| April 8, 1935 | 5.000 | 12.97 |
| April 15, 1935 | 5.125 | 13.26 |
| April 22, 1935 | 5.250 | 13.32 |
| April 29, 1935 | 5.250 | 13.32 |
| May 6, 1935 | 5.250 | 13.56 |
| May 13, 1935 | 5.250 | 13.56 |
| May 20, 1935 | 5.375 | 13.56 |
| May 27, 1935 | 5.500 | 13.56 |
| June 3, 1935 | 5.625 | 13.56 |
| January 6, 1936 | 5.625 | 13.35 |
| January 13, 1936 | 6.125 | 13.45 |
| January 20, 1936 | 6.125 | 13.93 |
| January 27, 1936 | 6.125 | 13.93 |

200

mal [49] and normal retail prices. To be sure, when the tank car spot market levelled out on a plateau from June to the end of 1935, there was not quite the same evenness in the higher plateau of the average retail prices. For there were during the period in question large numbers of retail price cuts in various parts of the Mid-Western area, though they diminished substantially during the spring and summer of 1935. Yet the average service station price [50] (less tax) having reached 13.26¢ by the middle of April (from 12.56¢ near the first of March) never once fell below that amount; advanced regularly to 13.83¢ by the middle of June; declined to 13.44¢ in August; and after an increase to 13.60¢ during the last of the summer remained at 13.41¢ during the balance of 1935 except for a minor intermediate drop. In sum, the contours of the retail prices conformed in general to those of the tank car spot markets. The movements of the two were not just somewhat comparable; they were strikingly similar. Irrespective of whether the tank car spot market prices controlled the retail prices in this area, there was substantial competent evidence that they influenced them—substantially and effectively. And in this connection it will be recalled that when the buying program was formulated it was in part predicated on the proposition that a firm tank car market was necessary for a stabilization of the retail markets. As reported by one who attended the meeting on February 5, 1935, where the buying program was being discussed: "It was generally assumed that all companies would come into the picture since a stable retail market requires a higher tank car market."

---

[49] Prices below the normal prices which Standard posted.

[50] Average price (28 cities Mid-Western area) for Standard's regular gasoline.

## IV. *Other Circumstances Allegedly Relevant to the Offense Charged in the Indictment.*

The following facts or circumstances were developed at the trial by testimony or other evidence or were embraced in offers of proof made by respondents.

### A. ALLEGED KNOWLEDGE AND ACQUIESCENCE OF THE FEDERAL GOVERNMENT.

Such of the following facts as were included in respondents' offers of proof were not sought to be proved in order to establish immunity from prosecution under the anti-trust laws. For admittedly the authorization under the National Industrial Recovery Act necessary for such immunity [51] had not been obtained. Rather respondents' offers of proof were made in order to show the circumstances which, respondents argue, should be taken into consideration in order to judge the purpose, effect and reasonableness of their activities in connection with the buying program.

Arnott testified that on January 8 or 9, 1935, he reported the appointment of the Tank Car Stabilization Committee to officials of the Petroleum Administrative Board who, he said, expressed great interest in it. A member of that Committee late in January 1935 advised the Chairman of that Board of the "necessity for action in getting tank car prices up before it is too late." The chairman replied that "the tank car situation in relation to the price of crude is one about which we have no disagreement. How to bring about a correction is the stumbling block." There was evidence that at least general information concerning the meetings of the Tank Car Stabilization Committee was given a representative of the Board in February 1935. In March 1935 the Code

---

[51] Sec. 5 is set forth, *supra*, note 18.

authorities, with the approval of the Administrator, asked the major companies to curtail their manufacture of gasoline during that month by 1,400,000 barrels. The purpose was said to be to aid the small refiners by forcing the majors to buy part of their requirements from them. A voluntary curtailment of some 960,000 barrels was made.

On March 12, 1935, Arnott saw the Chairman and at least one other representative of the Board. Among other things the buying programs were discussed. Arnott did not ask for the Board's approval of these programs nor its "blessing." A representative of the Board testified that Arnott told them that he was conducting those buying programs "on his own responsibility." Arnott denied this. The Chairman of the Board asked Arnott if the programs violated the anti-trust laws. Arnott said he did not believe they did and described what his group was doing. Arnott testified that he felt that the Board thought the program was sound and hoped it would work; and that if he had thought they disapproved, he would have discontinued his activities. There was no evidence that the Board told Arnott to discontinue the program. But on March 13, 1935, Arnott in addressing the District Allocators' meeting said, respecting these buying programs:

"I am perfectly conscious that we have made other efforts at times to have this question dealt with. It has always been done in group form. That has involved agreements, group agreements. Those of us who have had anything to do whatsoever with the whole national picture, who have come to Washington and have had any experience with the PAB and eventually the Department of Justice, know just how long that road is, and for some good reason or for some unknown reason or for no reason

at all those agreements seem to have disappeared; those outstanding attempts—and they were really sincere and worthy attempts—have disappeared in a sort of cloud of mystery, and I don't think I, for one, or anybody else can tell you just where they have gone—they are out of our minds, they are completed, they are finished, and we are not interested."

Respondents also offered to prove that a committee of the industry (the Blazer Committee) appointed by the Administrator to study the condition of the small units in the industry, made a report to him in March 1935 which stated, *inter alia*, as a recommendation:

"We know of nothing, apart from continued improvement in crude production control, which would be so helpful to the tank-car price of gasoline at this time as the substantial buying of distress gasoline by major companies. We understand a program of this sort is being considered by the Industry now in connection with a broad stabilization program. We therefore urge that the Administrator give it his approval and active support." [52]

They also offered a memorandum dated March 22, 1935, from the Chairman of the Petroleum Administrative

---

[52] That report went on to say:

". . . we believe such a program might be successful in raising both tank-car and retail prices to their proper level in relationship to crude oil prices.

"If higher tank-car prices are obtained, we believe they can be sustained only by corresponding increases in retail gasoline prices; otherwise, the burden merely would be shifted from small refiners to small marketers, who in many instances have been in just as much distress as the refiners. We find that abnormally low retail prices can depress tank-car prices just as much as low tank-car prices can pull down the retail price structure. Thus it appears to be essential that both prices move up together."

Board to the Administrator [53] commenting on the above report and making the following suggestion:

"We believe success in Code administration, assuming that it is to continue, requires that some of the recommendations made should be adopted; e. g., we have encouraged stabilization efforts designed at this time to aid the independent refiner, . . ."

On April 2, 1935, the Administrator wrote Arnott, referred to his letter of July 20, 1934 and stated, *inter alia:* "The matter that at present concerns me is the necessity of complying with the requirements of the basic law. In authorizing the formulation of a stabilization program, I necessarily conditioned the authority granted, by providing that the requirements of Clause 2 of Subsection (a) of Section 3 of the National Industrial Recovery Act should be observed. I know you will appreciate that agreements between supplying companies which might be in conflict with the anti-trust laws of the United States require specific approval after due consideration if companies are to receive the protection afforded by Sections 4 and 5 of the National Industrial Recovery Act.

---

[53] The Administrator was reported as saying about that report that if a parity between crude oil prices and gasoline prices did not come soon he would call a meeting of representatives of the industry to see what could be done about it. On March 30, 1935, according to respondents, the Administrator wrote concerning that report:

"Concerning the independent refiners, other than those in California, it appears from the report of the Committee on Small Enterprise that the outstanding difficulty is due to the disparity between posted crude oil prices and refinery realizations. This situation has been deplorable for many months, but it is my understanding that at present the activity of the Stabilization Committees is having a distinct effect in the improvement of refinery prices, and that were it not for old contracts, many of which are badly shaded with respect to the posted price, the independent refiner is approaching a normal market structure."

Respondents also offered to prove that the Blazer Committee advised the Board in April 1935 that there was then no occasion to

"I understand that the temporary character of a number of situations and the need for immediate action has made formalized agreements impracticable and in a number of instances they may be unnecessary. However, when the understandings arrived at as bases of solution of price wars affecting the industry over a considerable area are intended to operate over a definite period of time or involve substantial changes in the policy of the various supplying companies made only in consideration of similar action on the part of other companies, it is necessary that the procedure required by the Recovery Act be followed in order that the arrangement be legal. If any such agreements have been made I should like a report as to them. If they require approval to be effective . . . I should be glad to give consideration to them under the provisions of the Act."

On April 22, 1935, the Petroleum Administrative Board wrote a letter to Arnott imposing three conditions on general stabilization work: (1) there should be no stabilization meeting without a representative of the Board being present; (2) every element in the industry should be heard from before any decisions were made; (3) no general instructions should be given under the July 20, 1934 letter. A meeting of Arnott's committee and members of the Board was held on May 8, 1935. A representative of the Board testified that they called Arnott "on the carpet to request him to explain" to them "what he had been doing." Arnott's group considered the conditions imposed by the Board quite impossible. The Board assigned two of its staff to work the problem out with one of Arnott's men. According to the testimony of one of the representatives of the Board at that meeting, Arnott

reduce crude oil prices since "we consider tank car gasoline prices now almost up to parity with sufficient additional advances anticipated in both tank car and retail prices"; and expressed its satisfaction "with the success of the program to stabilize tank-car markets."

did not ask for the Board's approval of the buying pro-
grams—nothing being said "one way or the other, about
approval or disapproval." And he testified that Arnott
in substance was told at that meeting by the Board's
Chairman that the letter of July 20, 1934, from the Ad-
ministrator to Arnott (quoted *supra* p. 175) did not give
authority to conduct any buying program;[54] and that
Arnott said he was not relying on that letter for approval.
Arnott, however, testified that he recalled no such state-
ment made by the Board's Chairman. Apparently, how-
ever, Arnott, in answer to questions, gave a general ex-
planation of the buying programs, stating that the majors
were continuing informally to buy; that there was no
pool; that no one was obliged to make purchases; that
they were trying to lift from independent refiners dis-
tress gasoline which was burdening the market.[55]

Respondents also offered to prove that on May 14,
1935, the Chairman of the Petroleum Administrative
Board asked Arnott to undertake to stabilize the Penn-
sylvania refinery market in the way that he had stabilized
the Mid-Continent refinery market; that in connection
with this request the Board evinced support and approval

[54] Respondents offered to prove that Arnott's lawyer advised him
on July 31, 1934, that although the letter of July 20, 1934, was "not
precisely an approval" by the Administrator of any agreement which
gave "complete protection" from any prosecution under the anti-trust
laws, it nevertheless was "for all practical purposes a complete pro-
tection to you and your committees to engage in all reasonable activi-
ties to restore prices to normal levels."

[55] A sub-committee of the Planning & Coordination Committee met
with the Board on May 10, 1935, to discuss the report of the Blazer
Committee. The recommendation in that report that the majors
buy distress gasoline from the independents was discussed. Arnott
testified that his group told the Board that "we already had buying
of gasoline in effect" to which the Chairman of the Board was said to
have replied "That is quite so and disposes of that part of the
report."

of the Mid-Continent buying program; and that Arnott undertook to do what he could in the matter and called a meeting of the Pennsylvania refiners for May 28, 1935. Apparently the *Schechter* decision terminated that undertaking.

Respondents also offered portions of a final report [56] prepared by the Marketing Division of the Petroleum Administrative Board which discussed the work of the General Stabilization Committee [57] saying, *inter alia:* "One of the most important was the tank-car committee, which attempted to get the tank-car market raised more in line with the price of crude recovery cost on the theory that a firm tank-car market was essential to a stabilized retail structure." And respondents offered testimony of a member of the Board before a Senate Committee in 1937 respecting the "buying pool efforts, that began in December of 1933 and continued from then on during the entire period of the Petroleum Code." That testimony was: "It was an effort of the Department and the industrial committees to bring about the normal relationship between gasoline prices and crude oil prices, in order to permit the independent, non-integrated refiner to be able to operate without loss."

In sum, respondents by this and similar evidence offered to establish that the Petroleum Administrative Board knew of the buying programs and acquiesced in them. And respondents by those facts, together with those discussed under II, *supra,* undertook to show that their objectives under the buying programs were in line

---

[56] Prepared between December 1935 and February 1936 and issued in June 1936 by the Department of the Interior.

[57] In speaking of the general work of this Committee (which as we have noted was set up to deal with price wars) the report stated: "The stabilization program was perhaps the outstanding development under the code."

208

with those of the federal government under the Code: to keep the price of crude oil at a minimum of $1 a barrel; to restore the wholesale price level of gasoline at the refinery to a parity with crude oil; to stabilize retail prices at a normal spread between the refinery price and the retail price.

B. OTHER FACTORS ALLEGED TO HAVE CAUSED OR CONTRIBUTED TO THE RISE IN THE SPOT MARKET.

Respondents do not contend that the buying programs were not a factor in the price rise and in the stabilization of the spot markets during 1935 and 1936. But they do contend that they were relatively minor ones, because of the presence of other economic forces such as the following:

1. *Control of production of crude oil.*

Under the Code an attempt was made for the first time to balance the production of crude oil with the consumptive demand for gasoline. Monthly estimates of gasoline consumption would be made by the Bureau of Mines. The quantity of crude oil necessary to satisfy that demand was also estimated, broken down into allowables for each state, and recommended to the states. And there was evidence that the states would approximately conform to those recommendations. After the Code the oil states continued the same practice under an Interstate Compact which permitted them to agree as to the quantities of crude oil which they would allow to be produced.[58]

2. *Connally Act.*

As we have noted, this law was enacted late in February 1935 and began to be effective the first part of March 1935. Prior to this act, control of hot oil by the states

---

[58] This Compact (49 Stat. 939) was authorized in February 1935 and became effective in August 1935.

had not been effective for any extended period of time. Throughout 1933 and 1934 from 150,000 to 200,000 barrels of crude oil a day were estimated to have been produced in East Texas in excess of the state's allowables, much of it going into interstate commerce. After the Connally Act went into operation, no hot gasoline went into interstate commerce according to respondents' evidence.

3. *$1 Crude oil.*

As we have noted, crude oil was brought to a dollar a barrel near the end of September 1933. Before the Connally Act, however, hot oil flooded the market at substantially lower prices. Gasoline produced from hot oil forced the price of gasoline produced from crude oil down below cost. But with the elimination of the hot oil, fluctuations in the price of crude ceased. This had a stabilizing effect on the price of gasoline.

4. *Increase in consumptive demand.*

Beginning in the spring of 1935 there was an increase in demand for gasoline. During the whole indictment period every month showed an increase over the corresponding month in the previous year. For the entire year of 1935 consumption for the country as a whole was 7% more than for 1934; that for 1936 was about 10% over 1935—substantially the same increases taking place in the Mid-Western area.

5. *Control of inventory withdrawal and of manufacture of gasoline.*

Under the Code crude oil could be withdrawn from storage only with the approval of the Administrator. Also under the Code there were manufacturing quotas for gasoline which through Code authorities were allocated among the refiners. In March 1935, as we have seen, gasoline inventories of the majors were reduced by over

900,000 barrels through a voluntary curtailment program. The demand was so heavy that the industry withdrew from storage and refined over 22,000,000 barrels of crude oil in storage in 1935. Further, imports of crude oil were limited by order of the Administrator.

6. *Improved business conditions.*

The years 1935 and 1936 were marked by improving general business conditions and rising prices everywhere.

Much testimony was taken on these and related points. It was designed to show that under the conditions which existed during the indictment period, stability in the market was to be expected from the play of these various economic forces. For it was argued that by reason of those forces supply and demand were brought into a reasonable continuing balance with the resultant stabilization of the markets. And there was much testimony from respondents' witnesses that the above factors as well as the buying programs did contribute to price stability during this period. But no witness assumed to testify as to how much of a factor the buying program had been.

V. *Application of the Sherman Act.*

### A. CHARGE TO THE JURY

The court charged the jury that it was a violation of the Sherman Act for a group of individuals or corporations to act together to raise the prices to be charged for the commodity which they manufactured where they controlled a substantial part of the interstate trade and commerce in that commodity. The court stated that where the members of a combination had the power to raise prices and acted together for that purpose, the combination was illegal; and that it was immaterial how reasonable or unreasonable those prices were or to what extent they had been affected by the combination. It further charged that if such illegal combination existed,

it did not matter that there may also have been other factors which contributed to the raising of the prices. In that connection, it referred specifically to the economic factors which we have previously discussed and which respondents contended were primarily responsible for the price rise and the spot markets' stability in 1935 and 1936, viz. control of production, the Connally Act, the price of crude oil, an increase in consumptive demand, control of inventories and manufacturing quotas, and improved business conditions. The court then charged that, unless the jury found beyond a reasonable doubt that the price rise and its continuance were "caused" by the combination and not caused by those other factors, verdicts of "not guilty" should be returned. It also charged that there was no evidence of governmental approval which would exempt the buying programs from the prohibitions of the Sherman Act; and that knowledge or acquiescence of officers of the government or the good intentions of the members of the combination would not give immunity from prosecution under that Act.

The Circuit Court of Appeals held this charge to be reversible error, since it was based upon the theory that such a combination was illegal *per se*. In its view respondents' activities were not unlawful unless they constituted an unreasonable restraint of trade. Hence, since that issue had not been submitted to the jury and since evidence bearing on it had been excluded, that court reversed and remanded for a new trial so that the character of those activities and their effect on competion could be determined. In answer to the government's petition respondents here contend that the judgment of the Circuit Court of Appeals was correct, since there was evidence that they had affected prices only in the sense that the removal of the competitive evil of distress gasoline by the buying programs had permitted prices to rise to a normal competitive level; that their activities promoted rather

than impaired fair competitive opportunities; and therefore that their activities had not unduly or unreasonably restrained trade. And they also contend that certain evidence which was offered should have been admitted as bearing on the purpose and end sought to be attained, the evil believed to exist, and the nature of the restraint and its effect. By their cross-petition respondents contend that the record contains no substantial competent evidence that the combination, either in purpose or effect, unreasonably restrained trade within the meaning of the Sherman Act, and therefore that the Circuit Court of Appeals erred in holding that they were not entitled to directed verdicts of acquittal.

In *United States* v. *Trenton Potteries Co.*, 273 U. S. 392, this Court sustained a conviction under the Sherman Act where the jury was charged that an agreement on the part of the members of a combination, controlling a substantial part of an industry, upon the prices which the members are to charge for their commodity is in itself an unreasonable restraint of trade without regard to the reasonableness of the prices or the good intentions of the combining units. There the combination was composed of those who controlled some 82 per cent of the business of manufacturing and distributing in the United States vitreous pottery. Their object was to fix the prices for the sale of that commodity. In that case the trial court refused various requests to charge that the agreement to fix prices did not itself constitute a violation of law unless the jury also found that it unreasonably restrained interstate commerce. This Court reviewed the various price-fixing cases under the Sherman Act beginning with *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, and *United States* v. *Joint Traffic Assn.*, 171 U. S. 505, and said ". . . it has since often been decided and always assumed that uniform

price-fixing by those controlling in any substantial manner a trade or business in interstate commerce is prohibited by the Sherman Law, despite the reasonableness of the particular prices agreed upon." (p. 398.) This Court pointed out that the so-called "rule of reason" announced in *Standard Oil Co.* v. *United States,* 221 U. S. 1, and in *United States* v. *American Tobacco Co.,* 221 U. S. 106, had not affected this view of the illegality of price-fixing agreements. And in holding that agreements "to fix or maintain prices" are not reasonable restraints of trade under the statute merely because the prices themselves are reasonable, it said (pp. 397–398):

"The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed and without placing on the government in enforcing the Sherman Law the burden of ascertaining from day to day whether it has become unreasonable through the mere variation of economic conditions. Moreover, in the absence of express legislation requiring it, we should hesitate to adopt a construction making the difference between legal and illegal conduct in the field of business relations depend upon so uncertain a test as whether prices are reasonable—a determination which can be satisfactorily made

only after a complete survey of our economic organization and a choice between rival philosophies."

In conclusion this Court emphasized that the Sherman Act is not only a prohibition against the infliction of a particular type of public injury, but also, as stated in *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, 49, a "limitation of rights" which may be "pushed to evil consequences and therefore restrained."

But respondents claim that other decisions of this Court afford them adequate defenses to the indictment. Among those on which they place reliance are *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344; *Sugar Institute, Inc.* v. *United States,* 297 U. S. 553; *Maple Flooring Mfrs. Assn.* v. *United States,* 268 U. S. 563; *Cement Mfrs. Protective Assn.* v. *United States,* 268 U. S. 588; *Chicago Board of Trade* v. *United States,* 246 U. S. 231; and the *American Tobacco* and *Standard Oil* cases, *supra.*

But we do not think that line of cases is apposite. As clearly indicated in the *Trenton Potteries* case, the *American Tobacco* and *Standard Oil* cases have no application to combinations operating directly on prices or price structures.

And we are of the opinion that *Appalachian Coals, Inc.* v. *United States, supra,* is not in point.

In that case certain producers of bituminous coal created an exclusive selling agency for their coal. The agency was to establish standard classifications and sell the coal of its principals at the best prices obtainable. The occasion for the formation of the agency was the existence of certain so-called injurious practices and conditions in the industry. One of these was the problem of "distress coal"—coal shipped to the market which was unsold at the time of delivery and therefore dumped on the market irrespective of demand. The agency was to promote the systematic study of the marketing and dis-

tribution of coal, its demand and consumption; to maintain an inspection and an engineering department to demonstrate to customers the advantages of this type of coal and to promote an extensive advertising campaign; to provide a research department to demonstrate proper and efficient methods of burning coal and thus to aid producers in their competition with substitute fuels; to operate a credit department dealing with the reliability of purchasers; and to make the sale of coal more economical. That agency was also to sell all the coal of its principals at the best prices obtainable and, if all could not be sold, to apportion orders upon a stated basis. And, save for certain stated exceptions, it was to determine the prices at which sales would be made without consultation with its principals. This Court concluded that so far as actual purpose was concerned, the defendant producers were engaged in a "fair and open endeavor to aid the industry in a measurable recovery from its plight." And it observed that the plan did not either contemplate or involve "the fixing of market prices"; that defendants would not be able to fix the price of coal in the consuming markets; that their coal would continue to be subject to "active competition." To the contention that the plan would have a tendency to stabilize market prices and to raise them to a higher level, this Court replied (p. 374):

"The fact that the correction of abuses may tend to stabilize a business, or to produce fairer price levels, does not mean that the abuses should go uncorrected or that coöperative endeavor to correct them necessarily constitutes an unreasonable restraint of trade. The intelligent conduct of commerce through the acquisition of full information of all relevant facts may properly be sought by the coöperation of those engaged in trade, although stabilization of trade and more reasonable prices may be the result."

In distinguishing the *Trenton Potteries* case this Court said (p. 375):

"In the instant case there is, as we have seen, no intent or power to fix prices, abundant competitive opportunities will exist in all markets where defendants' coal is sold, and nothing has been shown to warrant the conclusion that defendants' plan will have an injurious effect upon competition in these markets."

Thus in reality the only essential thing in common between the instant case and the *Appalachian Coals* case is the presence in each of so-called demoralizing or injurious practices. The methods of dealing with them were quite divergent. In the instant case there were buying programs of distress gasoline which had as their direct purpose and aim the raising and maintenance of spot market prices and of prices to jobbers and consumers in the Mid-Western area, by the elimination of distress gasoline as a market factor. The increase in the spot market prices was to be accomplished by a well organized buying program on that market: regular ascertainment of the amounts of surplus gasoline; assignment of sellers among the buyers; regular purchases at prices which would place and keep a floor under the market. Unlike the plan in the instant case, the plan in the *Appalachian Coals* case was not designed to operate *vis-à-vis* the general consuming market and to fix the prices on that market. Furthermore, the effect, if any, of that plan on prices was not only wholly incidental but also highly conjectural. For the plan had not then been put into operation. Hence this Court expressly reserved jurisdiction in the District Court to take further proceedings if, *inter alia,* in "actual operation" the plan proved to be "an undue restraint upon interstate commerce." And as we have seen it would *per se* constitute such a restraint if price-fixing were involved.

Nor are *Maple Flooring Mfrs. Assn.* v. *United States* and *Cement Mfrs. Protective Assn.* v. *United States, supra,* at all relevant to the problem at hand. For the systems there under attack were methods of gathering and distributing information respecting business operations. It was noted in those cases that there was not present any agreement for price-fixing. And they were decided, as indicated in the *Trenton Potteries* case, on the express assumption that any agreement for price-fixing would have been illegal *per se.* And since that element was lacking, the only issues were whether or not on the precise facts there presented such activities of the combinations constituted unlawful restraints of commerce. A majority of the Court held that they did not.

Nor can respondents find sanction in *Chicago Board of Trade* v. *United States, supra,* for the buying programs here under attack. That case involved a prohibition on the members of the Chicago Board of Trade from purchasing or offering to purchase between the closing of the session and its opening the next day grains (under a special class of contracts) at a price other than the closing bid. The rule was somewhat akin to rules of an exchange limiting the period of trading, for as stated by this Court the "restriction was upon the period of price-making." No attempt was made to show that the purpose or effect of the rule was to raise or depress prices. The rule affected only a small proportion of the commerce in question. And among its effects was the creation of a public market for grains under that special contract class, where prices were determined competitively and openly. Since it was not aimed at price manipulation or the control of the market prices and since it had "no appreciable effect on general market prices," the rule survived as a reasonable restraint of trade.

There was no deviation from the principle of the *Trenton Potteries* case in *Sugar Institute* v. *United States,*

*supra.* For in that case so-called competitive abuses were not permitted as defenses to violations of the Sherman Act bottomed on a trade association's efforts to create and maintain a uniform price structure.

Thus for over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense. And we reaffirmed that well-established rule in clear and unequivocal terms in *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 458, where we said:

"Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition, *United States* v. *Trenton Potteries Co.,* 273 U. S. 392, and agreements which create potential power for such price maintenance exhibited by its actual exertion for that purpose are in themselves unlawful restraints within the meaning of the Sherman Act, . . ."

Therefore the sole remaining question on this phase of the case is the applicability of the rule of the *Trenton Potteries* case to these facts.

Respondents seek to distinguish the *Trenton Potteries* case from the instant one. They assert that in that case the parties substituted an agreed-on price for one determined by competition; that the defendants there had the power and purpose to suppress the play of competition in the determination of the market price; and therefore that the controlling factor in that decision was the destruction of market competition, not whether prices were higher or lower, reasonable or unreasonable. Respondents contend that in the instant case there was no elimination in the spot tank car market of competition

which prevented the prices in that market from being made by the play of competition in sales between independent refiners and their jobber and consumer customers; that during the buying programs those prices were in fact determined by such competition; that the purchases under those programs were closely related to or dependent on the spot market prices; that there was no evidence that the purchases of distress gasoline under those programs had any effect on the competitive market price beyond that flowing from the removal of a competitive evil; and that if respondents had tried to do more than free competition from the effect of distress gasoline and to set an arbitrary non-competitive price through their purchases, they would have been without power to do so.

But we do not deem those distinctions material.

In the first place, there was abundant evidence that the combination had the purpose to raise prices. And likewise, there was ample evidence that the buying programs at least contributed to the price rise and the stability of the spot markets, and to increases in the price of gasoline sold in the Mid-Western area during the indictment period. That other factors also may have contributed to that rise and stability of the markets is immaterial. For in any such market movement, forces other than the purchasing power of the buyers normally would contribute to the price rise and the market stability. So far as cause and effect are concerned it is sufficient in this type of case if the buying programs of the combination resulted in a price rise and market stability which but for them would not have happened. For this reason the charge to the jury that the buying programs must have "caused" the price rise and its continuance was more favorable to respondents than they could have required. Proof that there was a conspiracy, that its purpose was to raise prices, and that it caused or contributed to a price rise

is proof of the actual consummation or execution of a conspiracy under § 1 of the Sherman Act.

Secondly, the fact that sales on the spot markets were still governed by some competition is of no consequence. For it is indisputable that that competition was restricted through the removal by respondents of a part of the supply which but for the buying programs would have been a factor in determining the going prices on those markets. But the vice of the conspiracy was not merely the restriction of supply of gasoline by removal of a surplus. As we have said, this was a well organized program. The timing and strategic placement of the buying orders for distress gasoline played an important and significant role. Buying orders were carefully placed so as to remove the distress gasoline from weak hands. Purchases were timed. Sellers were assigned to the buyers so that regular outlets for distress gasoline would be available. The whole scheme was carefully planned and executed to the end that distress gasoline would not overhang the markets and depress them at any time. And as a result of the payment of fair going market prices a floor was placed and kept under the spot markets. Prices rose and jobbers and consumers in the Mid-Western area paid more for their gasoline than they would have paid but for the conspiracy. Competition was not eliminated from the markets; but it was clearly curtailed, since restriction of the supply of gasoline, the timing and placement of the purchases under the buying programs and the placing of a floor under the spot markets obviously reduced the play of the forces of supply and demand.

The elimination of so-called competitive evils is no legal justification for such buying programs. The elimination of such conditions was sought primarily for its effect on the price structures. Fairer competitive prices, it is claimed, resulted when distress gasoline was removed from the market. But such defense is typical of the prot-

estations usually made in price-fixing cases. Ruinous competition, financial disaster, evils of price cutting and the like appear throughout our history as ostensible justifications for price-fixing. If the so-called competitive abuses were to be appraised here, the reasonableness of prices would necessarily become an issue in every price-fixing case. In that event the Sherman Act would soon be emasculated; its philosophy would be supplanted by one which is wholly alien to a system of free competition; it would not be the charter of freedom which its framers intended.

The reasonableness of prices has no constancy due to the dynamic quality of business facts underlying price structures. Those who fixed reasonable prices today would perpetuate unreasonable prices tomorrow, since those prices would not be subject to continuous administrative supervision and readjustment in light of changed conditions. Those who controlled the prices would control or effectively dominate the market. And those who were in that strategic position would have it in their power to destroy or drastically impair the competitive system. But the thrust of the rule is deeper and reaches more than monopoly power. Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or fancied

competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination. If such a shift is to be made, it must be done by the Congress. Certainly Congress has not left us with any such choice. Nor has the Act created or authorized the creation of any special exception in favor of the oil industry. Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike. There was accordingly no error in the refusal to charge that in order to convict the jury must find that the resultant prices were raised and maintained at "high, arbitrary and non-competitive levels." The charge in the indictment to that effect was surplusage.

Nor is it important that the prices paid by the combination were not fixed in the sense that they were uniform and inflexible. Price-fixing as used in the *Trenton Potteries* case has no such limited meaning. An agreement to pay or charge rigid, uniform prices would be an illegal agreement under the Sherman Act. But so would agreements to raise or lower prices whatever machinery for price-fixing was used. That price-fixing includes more than the mere establishment of uniform prices is clearly evident from the *Trenton Potteries* case itself, where this Court noted with approval *Swift & Co.* v. *United States,* 196 U. S. 375, in which a decree was affirmed which restrained a combination from "raising or lowering prices or fixing uniform prices" at which meats will be sold. Hence, prices are fixed within the meaning of the *Trenton Potteries* case if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices. They are fixed because they are agreed upon. And the

fact that, as here, they are fixed at the fair going market price is immaterial. For purchases at or under the market are one species of price-fixing. In this case, the result was to place a floor under the market—a floor which served the function of increasing the stability and firmness of market prices. That was repeatedly characterized in this case as stabilization. But in terms of market operations stabilization is but one form of manipulation. And market manipulation in its various manifestations is implicitly an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone. Respondents, however, argue that there was no correlation between the amount of gasoline which the major companies were buying and the trend of prices on the spot markets. They point to the fact that such purchasing was lightest during the period of the market rise in the spring of 1935, and heaviest in the summer and early fall of 1936 when the prices declined; and that it decreased later in 1936 when the prices rose. But those facts do not militate against the conclusion that these buying programs were a species of price-fixing or manipulation. Rather they are wholly consistent with the maintenance of a floor under the market or a stablization operation of this type, since the need for purchases under such a program might well decrease as prices rose and increase as prices declined.

As we have indicated, the machinery employed by a combination for price-fixing is immaterial.

Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*. Where the machinery for price-fixing is an agreement on the prices to be charged or paid for the commodity in the interstate or foreign channels of trade, the power to fix prices exists

if the combination has control of a substantial part of the commerce in that commodity. Where the means for price-fixing are purchases or sales of the commodity in a market operation or, as here, purchases of a part of the supply of the commodity for the purpose of keeping it from having a depressive effect on the markets, such power may be found to exist though the combination does not control a substantial part of the commodity. In such a case that power may be established if as a result of market conditions, the resources available to the combinations, the timing and the strategic placement of orders and the like, effective means are at hand to accomplish the desired objective. But there may be effective influence over the market though the group in question does not control it. Price-fixing agreements may have utility to members of the group though the power possessed or exerted falls far short of domination and control. Monopoly power (*United States* v. *Patten,* 226 U. S. 525) is not the only power which the Act strikes down, as we have said. Proof that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that result is proof of the completion of a price-fixing conspiracy under § 1 of the Act.[59] The indictment in this case charged that this combination had that purpose and effect. And there was abundant evidence to support it. Hence the existence of power on the part of members of the combination to fix prices was but a conclusion from the finding that the buying programs caused or contributed to the rise and stability of prices.

[59] Under this indictment proof that prices in the Mid-Western area were raised as a result of the activities of the combination was essential, since sales of gasoline by respondents at the increased prices in that area were necessary in order to establish jurisdiction in the Western District of Wisconsin. Hence we have necessarily treated the case as one where exertion of the power to fix prices (i. e. the

As to knowledge or acquiescence of officers of the Federal Government little need be said. The fact that Congress through utilization of the precise methods here employed could seek to reach the same objectives sought by respondents does not mean that respondents or any other

actual fixing of prices) was an ingredient of the offense. But that does not mean that both a purpose and a power to fix prices are necessary for the establishment of a conspiracy under § 1 of the Sherman Act. That would be true if power or ability to commit an offense was necessary in order to convict a person of conspiring to commit it. But it is well established that a person "may be guilty of conspiring although incapable of committing the objective offense." *United States* v. *Rabinowich,* 238 U. S. 78, 86. And it is likewise well settled that conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring. *Nash* v. *United States,* 229 U. S. 373, 378. It is the "contract, combination . . . or conspiracy in restraint of trade or commerce" which § 1 of the Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other. See *United States* v. *Trenton Potteries Co.,* 273 U. S. 392, 402. Cf. *Retail Lumber Dealers' Assn.* v. *State,* 95 Miss. 337; 48 So. 1021. And the amount of interstate or foreign trade involved is not material (*Montague & Co.* v. *Lowry,* 193 U. S. 38), since § 1 of the Act brands as illegal the character of the restraint not the amount of commerce affected. *Steers* v. *United States,* 192 F. 1, 5; *Patterson* v. *United States,* 222 F. 599, 618–619. In view of these considerations a conspiracy to fix prices violates § 1 of the Act though no overt act is shown, though it is not established that the conspirators had the means available for accomplishment of their objective, and though the conspiracy embraced but a part of the interstate or foreign commerce in the commodity. Whatever may have been the status of price-fixing agreements at common law (Allen, Criminal Conspiracies in Restraint of Trade at Common Law, 23 Harv. L. Rev. 531) the Sherman Act has a broader application to them than the common law prohibitions or sanctions. See *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290, 328. Price-fixing agreements may or may not be aimed at complete elimination of price competition. The group making those agreements may or may not have power to control the market. But the fact that the group cannot control the market prices does not necessarily mean that the agreement as to prices has no utility to the members of the combination. The effec-

group may do so without specific Congressional authority. Admittedly no approval of the buying programs was obtained under the National Industrial Recovery Act prior to its termination on June 16, 1935, (§ 2 (c)) which would give immunity to respondents from prosecution under the Sherman Act. Though employees of the government may have known of those programs and winked at them or tacitly approved them, no immunity would have thereby been obtained. For Congress had specified the precise

---

tiveness of price-fixing agreements is dependent on many factors, such as competitive tactics, position in the industry, the formula underlying price policies. Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy. See Handler, Federal Anti-Trust Laws—A Symposium (1931), pp. 91 et seq.

The existence or exertion of power to accomplish the desired objective (*United States* v. *United States Steel Corp.*, 251 U. S. 417, 444–451; *United States* v. *International Harvester Co.*, 274 U. S. 693, 708–709) becomes important only in cases where the offense charged is the actual monopolizing of any part of trade or commerce in violation of § 2 of the Act. An intent and a power to produce the result which the law condemns are then necessary. As stated in *Swift & Co.* v. *United States*, 196 U. S. 375, 396, ". . . when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result." But the crime under § 1 is legally distinct from that under § 2 (*United States* v. *MacAndrews & Forbes Co.*, 149 F. 836; *United States* v. *Buchalter*, 88 F. 2d 625) though the two sections overlap in the sense that a monopoly under § 2 is a species of restraint of trade under § 1. *Standard Oil Co.* v. *United States*, 221 U. S. 1, 59–61; *Patterson* v. *United States, supra*, p. 620. Only a confusion between the nature of the offenses under those two sections (see *United States* v. *Nelson*, 52 F. 646; *United States* v. *Patterson*, 55 F. 605; *Chesapeake & O. Fuel Co.* v. *United States*, 115 F. 610) would lead to the conclusion that power to fix prices was necessary for proof of a price-fixing conspiracy under § 1. Cf. *State* v. *Eastern Coal Co.*, 29 R. I. 254; 70 A. 1; *State* v. *Scollard*, 126 Wash. 335; 218 P. 224.

manner and method of securing immunity. None other would suffice. Otherwise national policy on such grave and important issues as this would be determined not by Congress nor by those to whom Congress had delegated authority but by virtual volunteers. The method adopted by Congress for alleviating the penalties of the Sherman Act through approval by designated public representatives [60] would be supplanted by a foreign system. But even had approval been obtained for the buying programs, that approval would not have survived the expiration in June 1935 of the Act which was the source of that approval. As we have seen, the buying program continued unabated during the balance of 1935 and far into 1936. As we said in *United States* v. *Borden Co.*, 308 U. S. 188, 202, "A conspiracy thus continued is in effect renewed during each day of its continuance." Hence, approval or knowledge and acquiescence of federal authorities prior to June 1935 could have no relevancy to respondents' activities subsequent thereto. The fact that the buying programs may have been consistent with the

---

[60] It should be noted in this connection that the typical method adopted by Congress when it has lifted the ban of the Sherman Act is the scrutiny and approval of designated public representatives. Under the N. I. R. A. this could be done through the code machinery with the approval of the President as provided in §§ 3 (a) and 5, *supra* note 18. Under § 407 (8) of the Transportation Act of 1920 (41 Stat. 482; 49 U. S. C. § 5 (8)) carriers, including certain express companies, which were consolidated pursuant to any order of the Interstate Commerce Commission were relieved from the operation of the Anti-Trust laws. And see the Maloney Act (§ 15A of the Securities Exchange Act of 1934; 52 Stat. 1070) providing for the formation of associations of brokers and dealers with the approval of the Securities and Exchange Commission and establishing continuous supervision by the Commission over specified activities of such associations; and the Bituminous Coal Act of 1937 (50 Stat. 72), especially §§ 4 and 12—particularly as they relate to the fixing of minimum and maximum prices by the Bituminous Coal Commission.

general objectives and ends sought to be obtained under
the National Industrial Recovery Act is likewise irrele-
vant to the legality under the Sherman Act of respond-
ents' activities either prior to or after June 1935. For as
we have seen price-fixing combinations which lack Con-
gressional sanction are illegal *per se;* they are not eval-
uated in terms of their purpose, aim or effect in the elimi-
nation of so-called competitive evils. Only in the event
that they were, would such considerations have been
relevant.

Accordingly we conclude that the Circuit Court of Ap-
peals erred in reversing the judgments on this ground. *A
fortiori* the position taken by respondents in their cross
petition that they were entitled to directed verdicts of
acquittal is untenable.

### B. RESPONDENTS' OFFERS OF PROOF.

What we have said disposes of most of the errors al-
leged in exclusion of evidence. The offers of proof cover-
ing the background and operation of the National Indus-
trial Recovery Act and the Petroleum Code, the condition
of the oil industry, the alleged encouragement, coöpera-
tion and acquiescence of the Federal Petroleum Adminis-
tration in the buying programs and the like were properly
excluded, insofar as they bore on the nature of the re-
straint and the purpose or end sought to be attained.
For as we have seen the reasonableness of the restraint
was not properly an issue in the case.

There were, however, offers of proof alleged to be
relevant to the cause of the price rise and the subsequent
stability of the markets during the period in question.

In addition to the foregoing offers, respondents sought
to show that the presence of hot oil and hot gasoline
had greatly depressed the market from 1932 to early in
1935 when the Connally Act became effective, except for

one short period from October to December 1934; that beginning in October 1934 shipment of hot oil from East Texas into interstate commerce had for the first time been effectively controlled; that within a period of six weeks thereafter the tank car spot market rose 1½¢— an amount corresponding to the price rise from March to June 1935; that the various factors which primarily affect price were almost precisely the same in the fall of 1934 as they were in the spring of 1935; that the price of gasoline had borne a constant relationship to the price of crude oil from January 1918 to October 1933—that relationship disappearing when the price of hot oil fell below legal crude but reappearing in October 1934, and again in March 1935, when hot oil was eliminated; that gasoline prices were more depressed than the prices of other commodities and the cost of living in 1933 and 1934, and recovered and rose less than such other prices and the cost of living in 1935 and 1936.

We think there was no reversible error in exclusion of these various offers.

To the extent that they were designed to show that respondents by their buying programs had not raised the spot market prices to an artificial and non-competitive level, these offers of proof were properly denied as immaterial. For, as we have said, the reasonableness of the prices and the fact that respondents' activities merely removed from the market the depressive effect of distress gasoline were not relevant to the issues.

And to the extent that these offers of proof were aimed at establishing and evaluating other contributory causes for the price rise and market stability during the indictment period, they were not improperly denied. In the first place, the record is replete with evidence showing the condition of the oil industry at the time of the adoption of the code and during the code period. There was

ample testimony bearing on the other causal factors which respondents contend were primarily responsible for the price rise and market stability during the indictment period. Much of the refused testimony was merely cumulative in nature. A trial court has wide discretion in a situation of that kind. The trial lasted about three and a half months. Terminal points are necessary even in a conspiracy trial involving intricate business facts and legal issues. In the second place, the offer to show the market conditions late in 1934 when hot oil was temporarily under control was not improperly denied. There was substantial evidence in the record to demonstrate the depressive market effect of hot oil. While the offer was not wholly irrelevant to the issues, it was clearly collateral. The trial court has a wide range for discretion in the exclusion of such evidence. See *Golden Reward Mining Co.* v. *Buxton Mining Co.*, 97 F. 413, 416–417; *Chesterfield Mfg. Co.* v. *Leota Cotton Mills*, 194 F. 358, 359. Admission of testimony showing the market conditions late in 1934 would have opened an inquiry into causal factors as involved and interrelated as those present during the indictment period. That might have confused rather than enlightened the jury. In any event it would not have eliminated the buying programs as contributory causes to the market rise and stability in 1935 and 1936. And it would have prolonged the inquiry and protracted the trial. As once stated by Mr. Justice Holmes, one objection to the introduction of collateral issues is a "purely practical one, a concession to the shortness of life." *Reeve* v. *Dennett*, 145 Mass. 23, 28; 11 N. E. 938, 944. And see *Union Stock Yard & Transit Co.* v. *United States*, 308 U. S. 213, 223–224. Similar reasons sustain the action of the trial court in limiting the inquiry into general economic conditions antedating and during the indictment period. In conclusion, we do not think that there was an abuse of discretion by the

trial court in the exclusion of the proffered evidence. A great mass of evidence was received, the range of inquiry was wide, the factual questions relating to the oil industry and respondents' activities were intricate and involved. In such a case a new trial will not be ordered for alleged errors in exclusion of evidence where matters of substance are not affected. See *United States* v. *Trenton Potteries Co., supra,* p. 404.

VI. *Use of The Grand Jury Transcript.*

The Circuit Court of Appeals held that the trial court committed prejudicial error in refusing to permit defense counsel to inspect the transcript of grand jury testimony used to refresh the recollection of certain witnesses called by the government. Respondents here urge that the use made of the grand jury transcript was error because (1) they were denied the right to inspect it, (2) it had not been properly authenticated, (3) the reading of the grand jury testimony must have led the jury to conclude that it was affirmative testimony, and (4) such testimony was not given contemporaneously with the occurrences to which it was related. And in all respects, respondents contend that such use of the grand jury testimony was highly prejudicial.

There were about 90 instances when the government used that testimony. In practically all those cases, the witnesses were employees or representatives of respondents or former defendants, or were closely associated with them. That most of them were hostile witnesses—evasive and reluctant to testify—clearly appears from a reading of their entire testimony. Each of those witnesses had testified before the grand jury which returned the indictment in the case. At times counsel for the government would state to the court that he was suprised at the witness' answer to a question and that it contradicted testimony before the grand jury. More frequently

counsel would ask the witness if his memory could be refreshed by his grand jury testimony. During the first part of the trial government counsel apparently read some grand jury testimony to two witnesses from his notes. After objection had been made, the court instructed counsel to use the transcript. Soon thereafter, and early in the trial, the court adopted the practice of inspecting the transcript and itself seeking to refresh the witness' recollection by reading from his prior testimony. At no time was the transcript shown to the witness. At all times respondents appropriately objected to the practice.

Throughout the trial the stated single reason for the use of such prior testimony was the refreshment of the witness' recollection. Counsel for the defense were ever alert to denounce the practice, especially when it appeared that government counsel might seek to impeach the witness. In such cases the court normally would sustain the objection or admonish government counsel; or the question and answer would be stricken. In many instances where such testimony was used, the incident ended by the witness merely saying that his recollection had not been refreshed. In case it had been, he would state what his present recollection was. Only in about one-sixth of the instances was any inconsistency in testimony developed. In the balance, recollection was either not refreshed or the testimony which had been given was wholly or substantially consistent with the previous grand jury testimony.

During the trial the court told the jury:

"I have used some of the testimony and read some of it for the purpose only of refreshing the witnesses' memories, and many times I have indicated that there was no conflict or nothing inconsistent between the testimony of the witness and the transcript of testimony. The only reason we use this transcript of testimony of each witness before the Grand Jury is to, if we can, refresh their

memories so as to enable them to recall correctly what the fact is."

And the court made a similar statement in its charge to the jury.

As in case of leading questions, *St. Clair* v. *United States,* 154 U. S. 134, 150, such use of grand jury testimony for the purpose of refreshing the recollection of a witness rests in the sound discretion of the trial judge. See *Di Carlo* v. *United States,* 6 F. 2d 364, 367–368; *Bosselman* v. *United States,* 239 F. 82, 85; *Felder* v. *United States,* 9 F. 2d 872. He sees the witness, can appraise his hostility, recalcitrance, and evasiveness or .his need for some refreshing material, and can determine whether or not under all the circumstances the use of grand jury minutes is necessary or appropriate for refreshing his recollection. As once stated by Judge Hough, "The bald fact that the memory refreshing words are found in the records of a grand jury is not a valid objection." *Felder* v. *United States, supra,* p. 874. Normally, of course, the material so used must be shown to opposing counsel upon demand, if it is handed to the witness. *Morris* v. *United States,* 149 F. 123, 126; *Lennon* v. *United States,* 20 F. 2d 490, 493–494; Wigmore, Evidence (2d ed.), § 762. And the reasons are that only in that way can opposing counsel avoid the risks of imposition on and improper communication with the witness, and "detect circumstances not appearing on the surface" and "expose all that detracts from the weight of testimony." See 2 Wigmore, *supra,* p. 42. The first of these reasons has no relevancy here. And as to the second, no iron-clad rule requires that opposing counsel be shown the grand jury transcript where it is not shown the witness and where some appropriate procedure is adopted to prevent its improper use. That again is a matter which rests in the sound discretion of the court. Grand jury testimony is ordinarily confidential. See Wigmore, *supra,* § 2362.

But after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it. See *Metzler* v. *United States,* 64 F. 2d 203, 206. Since there is no inexorable rule which under all circumstances entitles the witness and his counsel to see the prior statement made under oath and since in this case the court itself examined and thus directly controlled the use of the grand jury testimony, we cannot say that the refusal to make it available to counsel for the defense is *per se* reversible error. To hold that it was error in the instances here under review would be to find abuse of discretion, where in fact we conclude from the entire record on this phase of the case that the judge supervised the procedure with commendable fairness. In sum, the selective use of this testimony and the precautions taken by the trial judge make it impossible for us to say that he transcended the limits of sound discretion in permitting it to be used by the government without making it available to the defense.

If the record showed that the refreshing material was deliberately used for purposes not material to the issues but to arouse the passions of the jurors, so that an objective appraisal of the evidence was unlikely, there would be reversible error. Likewise there would be error where under the pretext of refreshing a witness' recollection, the prior testimony was introduced as evidence. *Rosenthal* v. *United States,* 248 F. 684, 686. But here the grand jury testimony was used simply to refresh the recollection on material facts, *New York & Colorado Mining Syndicate & Co.* v. *Fraser,* 130 U. S. 611, not as independent affirmative evidence. *Bates* v. *Preble,* 151 U. S. 149. Furthermore, it was not used for impeachment purposes; and the content of this refreshing material related solely to conversations and events relevant to the formation and execution of the buying programs.

In addition, it clearly appears that the use of this material was not prejudicial. So far as the subject matter of the inquiry is concerned, that prior testimony was either cumulative or dealt only with the minutiae of the conspiracy. The record minus that testimony clearly establishes all the facts necessary for proof of the illegal conspiracy. No portion of it was dependent on the minor facts concerning which the memory of these witnesses was refreshed.[61] Hence, the situation is vastly different from those cases where essential ingredients of the crime were dependent on testimony elicited in that manner or where the evidence of guilt hung in delicate balance if that testimony was deleted. See *Little* v. *United States,* 93 F. 2d 401; *Putnam* v. *United States,* 162 U. S. 687. Hence assuming, *arguendo,* that there was error in the use of the prior testimony, to order a new trial would be to violate the standards of § 269 of the Judicial Code (28 U. S. C. § 391), since the "substantial rights" of respondents were not affected. There are no vested individual rights in the ordinary rules of evidence; their observance should not be reduced to an idle ceremony.

---

[61] Respondents strongly urge that this is not true in the case of the testimony of an employee of one of the trade journals. His prior testimony indicated (1) that the major companies were buying exactly at the journal quotations, so that the graph of those quotations represented prices paid under the buying program; (2) that prices paid by the majors "outweighed" the jobbers' sales reported to his journals. At the trial he testified that those grand jury statements were not true. And they were not. But those matters are not essential issues in the case. That purchases under the buying program did not lead the market up, that the vast majority of purchases were at or below the low quotations, that the volume of purchases did not eliminate all competition, that the spot market prices were still determined by competitive forces, that the volume of purchases under the buying programs was relatively small are wholly immaterial, as we have seen.

236

*Putnam* v. *United States, supra,* held it was prejudicial error to use grand jury minutes to refresh the memory of a witness unless that testimony was contemporaneous with the occurrences as to which the witness was testifying. There the testimony before the grand jury was more than four months after the occurrence. This Court held that because of that lapse of time the testimony was not contemporaneous. Whatever may be said of the *Putnam* case on the merits (see Wigmore, *supra,* § 761) it does not establish an inflexible four-months' period of limitation. There the event was a single isolated conversation, most damaging to the defendant. Here there was a continuing conspiracy extending at least up to the period when the witnesses were testifying before the grand jury. Much of the testimony related to events a year or more old. But in the main those matters were woven into the conspiracy, related to events in which the witness actively participated, concerned the regular business matters with which he was familiar, pertained to his regular employment, or constituted admissions against interest. On these facts we do not think there was an abuse of discretion on the part of the trial judge in permitting the testimony to be used. Measured by the test of whether or not the prior statement made under oath was reasonably calculated to revive the witness' present recollection within the rule of the *Putnam* case, there certainly cannot be said to have been error as a matter of law.

Respondents say that the manner employed in refreshing the recollection of the witnesses was bound to inculcate in the minds of the jurors the feeling that the witnesses were testifying falsely or were concealing the truth. But here again, we find no reversible error. The trial judge, as we have said, was alert to stop impeachment. And in view of the obvious hostility and evasiveness of most of those witnesses, we cannot say that the judge transcended the bounds of discretion in permitting

their memories to be refreshed in this manner. "As is true of most that takes place in a trial, the right result is a matter of degree, and depends upon the sense of measure of the judge." See *United States* v. *Freundlich*, 95 F. 2d 376, 379.

VII. *Arguments to the Jury by Government Counsel.*

Respondents complain of certain statements made to the jury by government counsel. Their objections are that government counsel (1) appealed to class prejudice; and (2) requested a conviction regardless of the evidence because the prosecution was convinced of respondents' guilt and because a conviction "was the wish and the desire of the highest officials in the Government of the United States."

Under the first of these, they point to the opening statement that this conspiracy involved some of the "biggest men" in the country—big in the sense of "controlling vast volumes of financial influence"; and that it is a "terrible thing that a group of influential, wealthy millionaires or billionaires should take over the power, take over the control, the power to make prices." At the close of those opening remarks and on objection of defense counsel the court counselled the jury that "any reference to the wealth of any of the defendants is entirely immaterial. A man of wealth has just as much standing in a court as a man that is poverty stricken."

But respondents complain that in the closing arguments the same matter was referred to again as follows: "A hundred lawyers employed—the very cream of the American Bar, the very best legal talent that these people can obtain—every one of them working night and day with suggestions as to how the red herring can be drawn across the clear cut issue in this case"; that it should not be taken for granted "that these more powerful people are above the law and can't be reached and

can't be brought to book"; that the "fear of corporate power in combination" is part of the American tradition as illustrated by a speech made in 1873 by a Wisconsin judge, who said: "There is looming up a new and dark power . . . The accumulation of individual wealth seems to be greater than it ever has been since the downfall of the Roman Empire. The enterprises of the country are . . . coldly marching, not for economic conquests only, but for political power . . . money is taking the field as an organized power. The question will arise . . . which shall rule, wealth or man? Which shall lead, money or intellect? Who shall fill the public stations, educated and patriotic free men, or the futile serfs of corporate capital?" But as to these statements no objection was made at the time by defense counsel.

There were other such references e. g., "malefactors of great wealth," "eager, grasping men" or corporations who "take the law into their own hands . . . without any consideration for the under-dog or the poor man . . . We are going to stop it, as our forefathers stopped it before us and left this country with us as it is now, or we are going down into ruin as did the Roman Empire." Counsel for the defense objected to these statements as improper and prejudicial. The court overruled the objections stating it would deal with the matter in its charge to the jury. In its charge the court warned against convicting a corporation "solely because of its size or the extent of its business"; that it was "your duty to give these corporations the same impartial consideration" as an individual or small corporation would receive; and instructed the jurors not to be concerned "with the financial condition of any of these defendants. Whether a man be rich or poor, he is entitled to the same consideration in this Court."

On this phase of the matter several observations are pertinent. In the first place, counsel for the defense

cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial. See *Crumpton* v. *United States,* 138 U. S. 361, 364. Of course appellate courts "in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings." See *United States* v. *Atkinson,* 297 U. S. 157, 160. But as we point out hereafter, the exceptional circumstances which call for an invocation of that rule are not present here. In the second place, it is not improper in a Sherman Act case to discuss corporate power, its use and abuse, so long as those statements are relevant to the issues at hand. For that subject is material to the philosophy of that Act. Its purposes and objectives are clearly legitimate subjects for discussion before the jury. But, thirdly, appeals to class prejudice are highly improper and cannot be condoned and trial courts should ever be alert to prevent them. Some of the statements to which respondents now object fall in this class. They were, we think, undignified and intemperate. They do not comport with the standards of propriety to be expected of the prosecutor. But it is quite another thing to say that these statements constituted prejudicial error. In the first place, it is hard for us to imagine that the minds of the jurors would be so influenced by such incidental statements during this long trial that they would not appraise the evidence objectively and dispassionately. In the second place, this was not a weak case as was *Berger* v. *United States,* 295 U. S. 78, where this Court held that prejudice to the accused was so highly probable as a result of the prosecutor's improper conduct "that we are not justified in assuming its non-existence." (p. 89.) Cf. *New York Central R. Co.* v. *Johnson,* 279

U. S. 310. Of course, appeals to passion and prejudice may so poison the minds of jurors even in a strong case that an accused may be deprived of a fair trial. But each case necessarily turns on its own facts. And where, as here, the record convinces us that these statements were minor aberrations in a prolonged trial and not cumulative evidence of a proceeding dominated by passion and prejudice, reversal would not promote the ends of justice.

Under the second of these objections, respondents complain of the plea to the jury not to "let your Government and the United States and its citizens and society down," and that government counsel "believe to the bottom of their hearts in the justice of the cause that they espouse here." No objection at that time was made by defense counsel. But they did object at the trial to the statements by government counsel, ". . . do you honestly think that these boys here (government counsel) . . . would be trying to convict these men unless that was the wish and the desire of the highest officials in the government of the United States?"; "You don't think the government of the United States would allow four or five lawyers to come out here and prosecute this case against them, against their wishes, or that the Secretary of the Department of the Interior would allow us to do it, if he didn't want it done?" The court overruled the objections stating, "I suppose we have a right to assume that they are here under the instructions of the Attorney General of the United States." Respondents further complain of the statements that the evidence is "so overwhelming and overpowering that it doesn't even leave the trace or the shadow of a doubt"; that if "you are going to say they are not guilty on this evidence, then you take the responsibility, I won't; you get an alibi, I won't"; that the hundreds of thousands of dollars spent by the government "in trying to get before you the facts" should not be

"thrown to the winds" nor should these men "go clear." But no objection was made at the time by defense counsel.

As respects the statement that it was the "wish and the desire of the highest officials" in the government to have defendants convicted, some background should be given. This came near the end of the closing arguments. In the opening statement, during the trial, and in the closing arguments the defense continuously emphasized the knowledge and acquiescence by government officials of the buying programs. As we have noted, that was one of the main lines of defense. From the beginning of the trial to the end, the defense sought to prove, not official approval in the legal sense, but official acquiescence or at least condonation. Bald statements were made that respondents "were conducting a program which resulted from the instigation and inducement of the Government itself"; after the *Schechter* case they endeavored to "stabilize marketing practices" at the "instance of officials of the Oil Administration"; "what was done by these defendants was done for the purpose of accomplishing the objectives and purposes of the National Industrial Recovery Act, and was undertaken at the request and pursuant to the authorization of the Secretary of the Interior, Mr. Ickes, the Administrator of the Petroleum Code"; respondents "acted to carry out the purposes and objectives sought by the Government and initiated by the Government . . . They were objectives defined by the President of the United States. They were purposes, the accomplishment of which the Secretary of the Interior had been charged, under his oath, to seek to obtain"; "with all this backing and all this help from the government, and all this urging from the government, are you going to brand these men as just selfish individuals?" On innumerable instances the impression was sought to be conveyed by subtle intimation, inference or suggestion

that responsibility for these buying programs should be placed on the shoulders of high government officials. Government counsel accordingly justified his statement on the grounds that it denied what the defense had continuously stated, viz., that the buying programs were conducted with the consent and approval of the Secretary of the Interior. At a subsequent point in the closing arguments government counsel again referred to the matter. On objection of defense counsel he withdrew the statement. And the court instructed the jury to disregard it, saying "This prosecution was commenced at the instigation of the Attorney General of the United States."

In view of these various circumstances we do not think that the above statements were prejudicial. Standing by themselves they appear to be highly improper. Even as a rebuttal to the defense which had been interposed throughout the trial, they overstep the bounds. But in view of the justification which respondents sought to establish for their acts, the subject matter of these statements was certainly relevant. The fact that government counsel transgressed in his rebuttal certainly cannot be said to constitute prejudicial error. For a reading of the entire argument before the jury leads to the firm conviction that the comments which respondents now rely on for their assertions of error were isolated, casual episodes in a long summation of over 200 printed pages and not at all reflective of the quality of the argument as a whole.

Respondents further urge as prejudicial error the assertions by government counsel of personal knowledge in contradiction of the record for the purpose of discrediting an important defense witness. The statement of government counsel was that in "1935 and 1936, you couldn't get a rowboat up the Mississippi River, north of Winona." Respondents contend that testimony as to navigability of that river was vitally material as establishing such outside competition as would have prevented them from

raising prices to artificial and non-competitive levels. But such testimony was wholly irrelevant, since the reasonableness of the prices was not properly an issue in the case. Furthermore, when objection was made to the remark, counsel withdrew it and the jury was instructed to disregard it. That must be deemed to have cured the error if it could be considered such. As stated in *Dunlop* v. *United States,* 165 U. S. 486, 498, "If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand."

VIII. *Granting of New Trials to Some Defendants.*

Respondents contend that the trial court committed reversible error in granting new trials to some defendants and denying them to respondents.

The court charged the jury that it could convict any of the defendants found to have been members of the combination and that it need not convict all or none. As has been noted, the jury found sixteen corporations and thirty individuals guilty. Thereafter the court discharged one corporation and ten individuals, and granted new trials to three corporations and fifteen individuals. Such action left the verdict standing as to only twelve corporations and five individuals. The trial court gave as its reason for granting some of the defendants a new trial its belief that they had not had "an adequate separate consideration of their defense, in view of the fact that as to some of them direct evidence of participation was lacking or slight, and the circumstantial evidence viewed as a whole may well have obscured other facts and circumstances shown, in some cases, to be highly suggestive of innocence, and in all cases entitled to be considered and weighed." *United States* v. *Standard Oil Co.,* (Indiana), 23 F. Supp. 937, 939. In denying the motions of respondents for a new trial it stated (p. 944) that there was "evidence to go to the jury and to sustain

its verdict as to every essential charge in the indictment"
as to them.[62]

Respondents' argument runs as follows: The court
charged the jury that it was the purpose and the power
of the combination to raise prices which were material.
Hence the fact that the jury found that the entire group
possessed such power does not necessarily mean that the
jury would have found that respondents acting alone pos-
sessed such power. Since the jury did not consider that
issue, it is argued that denial of a new trial to respondents
violates their constitutional right to a jury trial. And

---

[62] In this connection the court said (p. 944) that it appeared "with-
out dispute that a concerted buying movement took place in the
Mid-Continent field"; that as to its character and the existence of a
concerted East Texas program, there was "ample evidence to take
the case to the jury"; and that the proofs were sufficient to sustain
the verdict as to the charge that defendants "were able to and did
effectually tie the jobbers' price" in the Mid-Western area to the
tank car price in the spot market. It significantly added (p. 944):
"It is claimed by the defendants that they did not have the power to
control the price as charged, and that inasmuch as some of the large
companies did not or have not been shown to have participated in
the movement, the power of the defendants in that respect was in-
adequate for the purpose. This does not follow, for the reason that
large buyers both in East Texas and in the Mid-Continent fields,
while acting separately, were nevertheless buying for their require-
ments in these fields, as they had always done and as defendants had
every reason to believe they would continue to do. The defendants
were thus able to consider that these buyings would necessarily re-
duce the available gasoline which they proposed to take off the mar-
ket just as effectively as though these other companies had joined in
the program. The amount of distress gasoline would be exactly the
same in any event, and the proof shows that the surplus was in fact
a very small part of the total, so much so that most of the defendants
have shown that its acquisition in addition to other buying did not
materially increase their inventories. I am satisfied that there was
ample evidence to sustain the contention of the Government that the
defendants did have power to control the market, and that they did
so, as charged."

in support of their contention, respondents insist that Standard of Indiana alone (one of the defendants granted a new trial) possessed such power as would make it impossible for them to raise prices without its agreement and coöperation.

Respondents' argument does not focus sharply the basic and essential elements of the offense and of the instructions to the jury. As we have stated above, the offense charged in this indictment was proved once it was established that any of the defendants conspired to fix prices through the buying programs and that those programs caused or contributed to the price rise. Power of the combination to fix prices was therefore but a conclusion from the fact that the combination did fix prices. Hence in that posture of the case, the issue here is whether or not the finding of the jury that the buying programs affected prices was necessarily dependent on the participation in those programs of all who were convicted.

Obviously it was not. The order granting new trials in no manner impeached or questioned the evidence as to the total spot market purchases made by all companies (whether defendants, co-conspirators or others). Cf. *Bartkus* v. *United States*, 21 F. 2d 425. In their efforts to place a floor under the spot markets respondents assuredly received benefits and assistance from the purchases made by other companies. And the amount of benefit and assistance received did not necessarily depend on whether or not those other companies were co-conspirators. Market manipulators commonly obtain assistance from the activities of the innocent as well as from those of their allies. The fact that they may capitalize on the purchases of others is no more significant than the fact that they may gain direct or collateral benefits from market trends, bullish factors or fortuitous circumstances. And the mere fact that those circumstances

might have changed and that Standard of Indiana, say, might have substantially impaired the effect of the buying programs on prices by a change in its retail policies was as irrelevant as was the chance that the Connally Act might have been repealed. The effect of the concerted activities was not rebutted by the fact that changes in events might have destroyed that effect.

Nor did the case against respondents automatically fall when three of the corporate defendants [63] were awarded a new trial. We have here a situation quite different from that where the participation of those to whom a new trial was granted or against whom the judgment of conviction was reversed was necessary for the existence of the crime charged. See *Gebardi* v. *United States,* 287 U. S. 112; *Morrison* v. *California,* 291 U. S. 82; *King* v. *Plummer* [1902], 2 K. B. 339. In this case the crime was not indivisible (cf. *Queen* v. *Gompertz,* 9 A. & E. (N. S.) 824; *Feder* v. *United States,* 257 F. 694) in the sense that the existence of a conspiracy under the Sherman Act was necessarily dependent on the coöperation of the other defendants with respondents. Nor was the case submitted to the jury on the assumption that the participation of any of the corporations which were granted new trials was indispensable to the finding of a conspiracy among the rest. As we have seen, the court charged that the jury could convict any of the defendants found to have been members of the combination and that it need not convict all or none. It was the existence of a combination and the participation in it of all or some of the defendants which were important, not the identity of each

---

[63] The question of the effect of the buying programs on market prices obviously concerns only the corporate defendants. The one corporate defendant granted after verdict, a directed verdict of acquittal was The Globe Oil & Refining Co. (Kansas). The record does not show that this company made any spot market purchases in 1935 or 1936.

and every participant. A conspiracy under the Sherman Act may embrace two or more individuals or corporations. Conviction of some need not await the apprehension and conviction of all. The erroneous conviction of one does not necessarily rebut the finding that the others participated. The theory of the charge to the jury was not that the defendants must be convicted, if at all, as a body; rather the issue of guilt was distributive; the identity of all the co-conspirators was irrelevant.

In a Sherman Act case, as in other conspiracy cases, the grant of a new trial to some defendants and its denial to others is not *per se* reversible error. After the jury's verdict has been set aside as respects some of the alleged co-conspirators, the remaining ones cannot seize on that action as grounds for the granting of a new trial to them, unless they can establish that such action was so clearly prejudicial to them that the denial of their motions constituted a plain abuse of discretion. See *Dufour* v. *United States,* 37 App. D. C. 497, 510–511; *State* v. *Christianson,* 131 Minn. 276, 280; 154 N. W. 1095; *Commonwealth* v. *Bruno,* 324 Pa. 236, 248; 188 A. 320; *People* v. *Kuland,* 266 N. Y. 1; 193 N. E. 439; *Browne* v. *United States,* 145 F. 1. There is a complete lack of any showing of abuse of discretion here, for no prejudice has been established.

Hence this case falls within the well-established rule that neither this Court nor the Circuit Court of Appeals will review the action of a federal trial court in granting or denying a motion for a new trial for error of fact, since such action is a matter within the discretion of the trial court. *Fairmount Glass Works* v. *Cub Fork Coal Co.,* 287 U. S. 474. Certain exceptions have been noted, such as instances where the trial court has "erroneously excluded from consideration matters which were appropriate to a decision on the motion." *Fairmount Glass Works* v. *Cub Fork Coal Co., supra,* p. 483. But there

are no such circumstances here. No iota of evidence has been adduced that the trial court in denying respondents' motions failed to take into consideration the effect of the buying programs on gasoline prices in the Mid-Western area. In fact it seems apparent that the trial court considered that issue and ruled thereon adversely to respondents. It concluded in substance that whoever may have been all the members of the conspiracy, there was ample evidence to go to the jury on the nature and effect of these programs.

Certainly, denial of a motion for a new trial on the grounds that the verdict was against the weight of the evidence would not be subject to review. *Moore* v. *United States,* 150 U. S. 57, 61–62; *J. W. Bishop Co.* v. *Shelhorse,* 141 F. 643, 648; *O'Donnell* v. *New York Transp. Co.,* 187 F. 109, 110. In substance no more than that is involved here.

IX. *Variance.*

By their cross petition respondents contend that there was a fatal variance between the agreement charged in the indictment and the agreement proved, with a consequent violation of respondents' rights under the Sixth Amendment.

As we have noted, certain trade journals were made defendants. The indictment charged that they were "the chief agencies and instrumentalities" through which the illegally raised prices affected prices paid for gasoline in the Mid-Western area; that they "knowingly published and circulated as such price quotations the wrongfully and artificially raised and fixed prices for gasoline paid by" defendants in the buying programs, while "representing the price quotations published by them" to be gasoline prices "prevailing in spot sales to jobbers in tank car lots" and while "knowing and intending them to be relied on as such by jobbers and to be made the basis of prices to jobbers."

At the close of the government's case the indictment was dismissed, on motion of the government, as against all trade journal defendants who went to trial. This was clearly proper, as the evidence adduced exculpated them from any wrongdoing. But respondents contend that the device charged in the indictment was one by which respondents were to pay higher than the actual spot market prices for their purchases and then to substitute in the trade journal quotations such prices for the lower prices actually paid by jobbers in spot market sales. Since there was failure of proof on this point of falsification, it is argued that there was a variance. For, according to respondents, that feature was an integral and essential part of the plan as charged.

We agree with the Circuit Court of Appeals that there was no variance. Analysis of the indictment which we have set forth, *supra*, pp. 166–170, makes it clear that the charge against respondents was separate from and independent of the charge against the trade journals and that the allegations against those journals constituted not the only means by which the conspiracy was to be effectuated but only one of several means (*supra*, pp. 167–168). In effect, those charges in the indictment sought to connect the trade journals with the conspiracy as aiders and abettors. On the other hand, the gist of the indictment charged a conspiracy by defendants (1) to raise and fix the spot market prices and (2) thereby to raise and fix the prices in the Mid-Western area. So far as means and methods of accomplishing those objectives were concerned, the charge of falsification of the trade journal quotations was as unessential as was the charge, likewise unproved, that defendants caused the independent refiners to curtail their production. The purpose and effect of the buying programs in raising and fixing prices were in no way made dependent on the utilization of fraudulent trade journal quotations. As charged, the trade journals

were the chief instrumentalities by which the spot market prices were converted into prices in the Mid-Western area. Hence under this indictment they were wholly effective for respondents' purposes, though they were innocent and though their quotations were not falsified as charged. A variation between the means charged and the means utilized is not fatal. And where an indictment charges various means by which the conspiracy is effectuated, not all of them need be proved. See *Nash* v. *United States*, 229 U. S. 373, 380. Cf. *Boyle* v. *United States*, 259 F. 803, 805.

X. *Jurisdiction or Venue.*

The Sixth Amendment provides that the accused shall be tried "by an impartial jury of the State and district wherein the crime shall have been committed." Respondents contend that the district court for the Western District of Wisconsin had no jurisdiction or venue to try them since the crime was not committed in that district. The Circuit Court of Appeals held to the contrary, one judge dissenting.

As we have noted, the indictment charged that the defendants (1) conspired together to raise and fix the prices on the spot markets; (2) raised, fixed, and maintained those prices at artificially high and non-competitive levels and "thereby intentionally increased and fixed the tank car prices of gasoline contracted to be sold and sold in interstate commerce as aforesaid in the Mid-Western area (including the Western District of Wisconsin)"; (3) have "exacted large sums of money from thousands of jobbers" in the Mid-Western area by reason of the provisions of the prevailing form of jobber contracts which made the price to the jobber dependent on the average spot market price; and (4) "in turn have intentionally raised the general level of retail prices prevailing in said Mid-Western area."

As we have seen, there was substantial competent evidence that the buying programs resulted in an increase of spot market prices, of prices to jobbers and of retail prices in the Mid-Western area. And it is clear that certain corporate respondents sold gasoline during this period in the Mid-Western area at the increased prices. The court charged the jury that even though they found that defendants had the purpose and power to raise the spot market prices, they must acquit the defendants unless they also found and believed beyond a reasonable doubt that defendants "have also intentionally raised and fixed the tank car price of gasoline contracted to be sold and which was sold in interstate commerce in the Mid-Western area, including the Western District of Wisconsin." It also charged that it was not enough "for the prosecution to show an increase in the tank car prices of gasoline within said area, but you must also find and believe beyond a reasonable doubt and to a moral certainty that the defendants combined and conspired together or with others for the purpose of increasing and fixing the same as well as for the purpose of raising and fixing the tank car prices in said spot markets, on one or more of them." It further charged that the jury in order to convict must find some overt acts in the Western District of Wisconsin; and that sales of gasoline therein by any of the defendants would constitute such overt acts.

Respondents, though agreeing that there were such sales in the Mid-Western area and that the prices on such sales were affected by the rise in the spot markets, deny that they were overt acts in pursuance of the conspiracy. Rather, they contend that each of such sales was an individual act of a particular conspirator in the ordinary course of his business by which he enjoyed the results of a conspiracy carried out in another district. That is to say, they take the position that the alleged conspiracy was limited to a restraint of competition in buying and

selling on the spot markets and included no joint agreement or understanding as respects sales in the Mid-Western area. In support of this view they cite the government's concessions that it "does not claim that each defendant 'entered into an agreement not to sell jobbers except in accordance with' the contract described in Paragraph 11 of the Indictment"; [64] and that it does not contend that defendants were "sitting around a table and agreeing on a uniform retail price." And they assert that there was no evidence that respondents agreed not to sell gasoline in the Western District of Wisconsin except on the basis of spot market prices.

Conspiracies under the Sherman Act are on "the common law footing": they are not dependent on the "doing of any act other than the act of conspiring" as a condition of liability. *Nash* v. *United States, supra,* at p. 378. But since there was no evidence that the conspiracy was formed within the Western District of Wisconsin, the trial court was without jurisdiction unless some act pursuant to the conspiracy took place there. *United States* v. *Trenton Potteries Co., supra,* pp. 402–403, and cases cited. We agree with the Circuit Court of Appeals that

---

[64] The standard form of jobber contract referred to in par. 11 of the indictment was described therein as follows: "The price of gasoline to the jobber shall be the average spot market price, determined by averaging the high and low spot market prices for gasoline of comparable octane rating published by defendant Platt's Oilgram, for the Tulsa, Oklahoma, market, and by defendant Chicago Journal of Commerce on date of shipment. If the average spot market price plus freight to destination shall allow the buyer a margin of less than 5½¢ per gallon below the service station price posted by defendant Standard of Indiana, then the buyer and the seller shall share equally in the deficit below a 5½¢ margin. In certain States in which the Standard of Indiana has recently discontinued the posting of retail prices, such jobber margins have been calculated on the basis of a margin of 2¢ below the dealer tank wagon prices posted by the Standard of Indiana (such tank wagon prices having usually been 3½¢ below the posted retail prices)."

there was ample evidence of such overt acts in that district. The finding of the jury on this aspect of the case was also supported by substantial evidence. As we indicated in our discussion of the buying programs, there was sufficient evidence to go to the jury that the conspiracy did not end with an agreement to make purchases on the spot markets; that those buying programs were but part of the wider stabilization efforts of respondents; that the chief end and objective were the raising and maintenance of Mid-Western prices at higher levels. As stated by the Circuit Court of Appeals a different conclusion would require a belief that respondents were "engaged in a philanthropic endeavor." They obviously were not. The fact that no uniform jobbers' contract and no uniform retail price policy were agreed upon is immaterial. The objectives of the conspiracy would fail if respondents did not by some formula or method relate their sales in the Mid-Western area to the spot market prices. The objectives of the conspiracy would also fail if respondents, contrary to the philosophy of all the stabilization efforts, indulged in price cutting and price wars. Accordingly, successful consummation of the conspiracy necessarily involved an understanding or agreement, however informal, to maintain such improvements in Mid-Western prices as would result from the purchases of distress gasoline. The fact that that entailed nothing more than adherence to prior practice of relating those prices to the spot market is of course immaterial. In sum, the conspiracy contemplated and embraced, at least by clear implication, sales to jobbers and consumers in the Mid-Western area at the enhanced prices. The making of those sales supplied part of the "continuous coöperation" necessary to keep the conspiracy alive. See *United States* v. *Kissel,* 218 U. S. 601, 607. Hence, sales by any one of the respondents in the Mid-Western area bound all. For a conspiracy is a partnership in crime; and an "overt act

of one partner may be the act of all without any new agreement specifically directed to that act." *United States* v. *Kissel, supra,* p. 608.

## XI. *Respondent McElroy.*

Respondent McElroy argues that the judgment of conviction rendered against him should be reversed and the indictment dismissed not only for the reasons heretofore discussed, but more specifically on the grounds that there was no substantial evidence that he had any knowledge of and participated in the unlawful conspiracy. His motion for a directed verdict at the conclusion of the case was denied by the trial court and the Circuit Court of Appeals held that there was no error in such denial. A question of law is thus raised, which entails an examination of the record, not for the purpose of weighing the evidence but only to ascertain whether there was some competent and substantial evidence before the jury fairly tending to sustain the verdict. *Abrams* v. *United States,* 250 U. S. 616, 619; *Troxell* v. *Delaware, L. & W. R. Co.,* 227 U. S. 434, 444; *Lancaster* v. *Collins,* 115 U. S. 222, 225. We have carefully reviewed the record for evidence of McElroy's knowledge of and participation in the conspiracy. But without burdening the opinion with a detailed exposition of the evidence on this point, we are of opinion that there was no error in the denial of his motion.

The judgment of the Circuit Court of Appeals is reversed and that of the District Court affirmed.

*Reversed.*

The Chief Justice and Mr. Justice Murphy did not participate in the consideration or decision of this case.

Mr. Justice Roberts, dissenting:

I regret that I am unable to agree to the court's decision. I think that for various reasons the judgment of the District Court should not stand.

The opinion fully and fairly sets forth the facts proved at the trial, and to its statement nothing need be added. Some of the reasons for my inability to agree with the court's conclusions follow:

---

The Government relied for venue in the Western District of Wisconsin upon the commission in that district of overt acts in aid of the alleged common enterprise. I think the indictment fails to allege, and the evidence fails to disclose, the commission of any such act in the district of trial. I agree with the dissenting judge in the Circuit Court of Appeals that the case should be dismissed for this reason.

Paragraph 17 of the indictment alleges that the spot market tank car prices of gasoline substantially influence the retail prices.

Paragraph 18 is the only one that defines the charged conspiracy. It alleges that the defendants and others, knowing the facts pleaded by way of inducement (including the fact that retail prices follow spot market tank car prices), "combined and conspired together for the purpose of artificially raising and fixing the tank car prices of gasoline in the aforementioned spot markets, and, as intended by them, defendants have artificially raised and fixed such spot market tank car prices of gasoline and have maintained such prices at artificially high and non-competitive levels and at levels agreed upon among them *and have thereby* intentionally increased and fixed the tank car prices of gasoline contracted to be sold, and sold, in interstate commerce as aforesaid in the Midwestern area (including the Western District of Wisconsin), . . ." It is further alleged that the defendants have arbitrarily, due to the form of their contract [1] with jobbers, exacted

---

[1] The form and use of this contract is described in paragraph 11 of the indictment.

large sums of money from jobbers and, in turn, have intentionally raised the general level of retail prices in the midwestern area (including the Western District of Wisconsin).

The sole and only conspiracy charged is the agreement artificially to raise and fix spot market tank car prices of gasoline in the Mid-Continent field.

Paragraph 19 is devoted to the *means* by which the conspiracy thus described was *"effectuated."* The conduct of the defendants in this respect is described as their engaging and participating in two concerted gasoline buying programs, one, the East Texas buying program, and the other the Mid-Continent buying program, for the purchase by each of them from independent refiners in spot transactions of large quantities of gasoline in the East Texas and Mid-Continent fields.

After describing these buying programs in subsequent paragraphs, the indictment, in paragraph 25, alleges that the conspiracy "has operated and has been carried out in part within the Western District of Wisconsin." The method of its operation in that district is described as follows: "In pursuance of said combination and conspiracy, defendant major oil companies (with the exception of Standard of Indiana and Gulf) *have contracted to sell and have sold and have delivered* large quantities of gasoline in tank car lots to jobbers within said district at the artificially raised and fixed and non-competitive prices aforesaid and have arbitrarily exacted from jobbers within said district large sums of money. Defendant major oil companies (with the exception of Gulf) have solicited and taken contracts and orders for said gasoline within said district, sometimes by sales representatives located there, which district has been an important market for their product and they have required retail dealers and consumers in said districts to pay artificially increased prices for gasoline as aforesaid, all by virtue of said combination

and conspiracy and pursuant to the purposes and ulti-
mate objectives thereof."

Thus, after describing the conspiracy as one to buy
on spot markets for the purpose of raising the price of
gasoline on those markets, the indictment purports to
charge, as overt acts, entirely unrelated transactions of
individual defendants in the resale of gasoline to jobbers
and at retail in the Western District of Wisconsin.

There is no evidence in the record that any of the pur-
chases made by the defendants pursuant to the conspiracy
was made in Wisconsin. But if the indictment could bear
the construction that the charged conspiracy involved
an agreement as to the terms of resale to jobbers and
retailers, proof was lacking to support any such alleged
agreement. Government counsel, both in pleading and
in admissions at trial, so conceded.

In its Bill of Particulars the Government said:

"The Government does not claim that each defendant
entered into an agreement not to sell jobbers except in
accordance with 'the contract described in paragraph 11
of the indictment.' "

At trial Government counsel repeatedly disavowed any
charge in the indictment or any claim of the Government
that there was an agreement amongst the defendants with
respect to the price at which gasoline should be sold to
jobbers or at retail. The evidence showed, without con-
tradiction, that the Standard Oil Company of Indiana was
the market leader in this area, and that when it posted
its price none of the other defendants could sell at a higher
price. It further showed that at various times Standard
was forced to reduce its price to meet the competition of
others. In this connection Government counsel made the
following statements:

". . . We do not say that the Standard of Indiana
when it posts a retail price first consults with the other
companies to find out what retail price should be posted.

"If that is what you're worrying about, if you think we're charging you with sitting around a table and agreeing on a uniform retail price, don't worry because that isn't what we are charging."

In its brief in this court the Government attempts to avoid the effect of these concessions by the statement that the defendants "were not free to sell as they pleased in the Midwestern areas" and adds that "an obligation to adhere to their prior price practice of selling on the basis of spot market prices *was implicit in their unlawful agreement.*" This amounts to saying that the conspiracy was not the one charged in the indictment but was a much more ample conspiracy not only to raise the general level of tank car prices on the spot market by purchasing on that market but to raise, maintain, and fix uniform resale prices to jobbers and retailers. But this contention does not aid the Government for there is no evidence of any agreement to raise, or to maintain, jobber and retail prices, but, on the contrary, evidence that competition in such sales existed during the period in question.

Situations arise, and results ensue, from the prosecution of any agreement or conspiracy. Individual defendants may expect benefits to follow from their adherence to a conspiracy or agreement; but benefits or results, whether anticipated or unforeseen, occurring after consummation of the conspiracy, and because of it, are not overt acts done in aid and furtherance of the conspiracy. The authorities to this effect are uniform.[2]

The Government relies on *United States* v. *Trenton Potteries Co.*, 273 U. S. 392. That case is clearly not in point. There the conspiracy was to fix the prices of the commodity manufactured and sold by the defendants and to adhere to the prices so fixed. This court held that

---

[2] *Lonabaugh* v. *United States*, 179 F. 476; *United States* v. *Black*, 160 F. 431; *Rose* v. *St. Clair*, 28 F. 2d 189.

a sale made, pursuant to that agreement, in the Southern District of New York afforded venue in that district of an indictment for violation of the Sherman Act. The case would be apposite if the pleading and proof in the instant case were of a conspiracy to fix and maintain jobber and retail prices and adherence to the agreement in sales to jobbers and retailers. Neither pleading nor proof goes to any such conspiracy.

---

In accordance with the Government's contention, the trial court repeatedly charged that, in order to convict, the jury must find that a combination existed and that the combination agreed to, *and had the power to,* raise the tank car spot market price of gasoline. Of course, the jury was at liberty to find that any number of the defendants less than all fulfilled the conditions named by the court. By its verdict the jury found that those who were convicted, as a body, (1) possessed the power to raise the price and (2) agreed so to do. The trial court granted a new trial to a number of defendants, including Standard of Indiana, the largest major oil company doing business in the area.

Standard was granted a new trial on the ground that there was no sufficient evidence to connect it with the conspiracy. By refusing new trials to the other corporate defendants the court has entered its own verdict that the others involved, excluding Standard, had the power, and agreed, to raise the level of spot market prices in the midwestern area. There is no jury verdict to that effect; no jury has ever passed upon that question, but an affirmative finding on that question is vital to the guilt of the defendants now before us. To affirm the judgment of conviction is to affirm a finding of fact by the trial judge without a jury and to deny the respondents the right to jury trial guaranteed by the Sixth Amendment of the Constitution.

260

The court's instructions to the jury were that they should return a verdict of guilty if they found that the defendants' actions had in any degree contributed to a rise in gasoline prices. The defendants insisted that the test was the effect of their combination upon competition, and that they could not be convicted unless the jury found that their agreement, and their conduct pursuant thereto, unreasonably restrained competition in interstate commerce.

There was substantial evidence that all the defendants agreed to, or did, was to act in concert to eliminate distress gasoline; that such gasoline was a competitive evil in that it tended to impair or destroy normal competition. There was substantial evidence that what they agreed to, and did, neither fixed nor controlled prices nor unreasonably affected normal competition and that their conduct affected prices only in the sense that the purchase of distress gasoline at going prices permitted prices to rise to a normal competitive level. There was no evidence that, as charged in the indictment, they agreed to, or in fact did, *fix* prices. The Court of Appeals, as I think, correctly held "that the substance of what was accomplished and agreed on was that the major companies would purchase from the independent refiners the latter's surplus gasoline at going market prices."

I think the defendants were entitled to have the jury charged that, in order to convict them, the jury must find that, although defendants knew the result of their activities would be a rise in the level of prices, nevertheless, if what they agreed to do, and did, had no substantial tendency to restrain competition in interstate commerce in transactions in gasoline the verdict should be not guilty.

As has been pointed out by this court, violation of the antitrust act depends upon the circumstances of indi-

vidual cases.[3] It is always possible to distinguish earlier decisions by reference to the facts involved in them but, in the course of decision in this court, certain principles have been laid down to which, I think, the charge of the court ran counter.

One of these firmly established principles is that concerted action to remove a harmful and destructive practice in an industry, even though such removal may have the effect of raising the price level, is not offensive to the Sherman Act if it is not intended and does not operate unreasonably to restrain interstate commerce; and such action has been held not unreasonably to restrain commerce if, as here, it involves no agreement for uniform prices but leaves the defendants free to compete with each other in the matter of price.[4]

No case decided by this court has held a combination illegal solely because its purpose or effect was to raise prices. The criterion of legality has always been the purpose or effect of the combination unduly to restrain commerce.

I think *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344, a controlling authority sustaining the defendants' contention that the charge foreclosed a defense available to them under the Sherman Act. It is said that their combination had the purpose and effect of putting a floor under the spot market for gasoline. But that was

---

[3] See *Maple Flooring Mfrs. Assn.* v. *United States,* 268 U. S. 563, 579.

[4] *United States* v. *American Tobacco Co.,* 221 U. S. 106, 178, 180; *United States* v. *Union Pacific R. Co.,* 226 U. S. 61, 84–85; *American Column & Lumber Co.* v. *United States,* 257 U. S. 377, 400, 417; *Maple Flooring Mfrs. Assn.* v. *United States,* 268 U. S. 563, 568; *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344, 362–3, 373–4; *Sugar Institute* v. *United States,* 297 U. S. 553, 597–8.

precisely the purpose and effect of the plan in the Appalachian case. True, the means adopted to overcome the effect of the dumping of distress products on the market were not the same in the two cases, but means are unimportant provided purpose and effect are lawful.

Ethyl Gasoline Corp. v. United States, 309 U. S. 436, is relied upon, but, in that case, as in United States v. Trenton Potteries Co., 273 U. S. 392, maintenance of prices fixed by agreement was involved. So also in Sugar Institute v. United States, 297 U. S. 553, condemned features of the common plan had to do with the maintenance of announced prices and the abstinence from selling certain sorts of sugar. The combinations or agreements in these cases specifically prevented competitive pricing or took a commodity out of competition. This is not such a case.

As I think, the error in the court's charge is well illustrated by the following instruction:

"If you should find that the defendants acting together, and those independent refiners acting in concert with them, did not have the power to raise the level of spot market prices in the spot markets referred to in the indictment, or that they did not combine for that purpose, and if you should find also that the purchase of the said gasoline by the defendants affected the spot market prices only indirectly and incidentally, then you may consider all the circumstances surrounding the activities of the defendants to determine whether they were intended to and did merely eliminate abuses which tended to produce destructive competition and restore competition to a fairer base and produce fairer price levels. In such event, you may conclude that the purchase of such gasoline in the manner shown by the evidence was reasonable and beneficial and not injurious to the public interest and that, therefore, the restraint of trade was not undue, and

not illegal, and you may acquit the defendants." (Italics supplied.)

This was to tell the jury that, if they found the combination had power and purpose to raise the general level of prices, they should convict without considering whether the defendants' concert of action was intended merely to remove a source of destructive competition, and without considering whether, as defendants contended and sought to prove, other factors in the industry, over which they had no control, limited their power to raise prices beyond a level which would be the normal result of the removal of the abuses engendered by the dumping of distress gasoline.

---

I think that the closing address of counsel for the Government is ground for setting aside the verdict.

It is true that to much that was objectionable in that address the defendants did not object or, if they did, failed to except. However, they assigned error to the whole of it and excepted to some of the more egregious violations of the canons of fair comment. I am of opinion that a situation is presented, which regardless of the technicalities of procedure, requires action by an appellate court. But, in any event, portions which are the subject of exception alone require a reversal of the judgment.

The final and closing address covers twenty-eight pages of the record. About five refer to the facts in the case. The balance consists largely of what the speaker himself characterized as "clowning" and personal references to counsel, parties, the court, and other subjects, the object of which apparently was to distract attention from the issues.

At many points counsel should have been stopped by the court and warned against continuance of such tactics.

The Circuit Court of Appeals said as to this matter:

"The Government does not undertake to justify much of the argument and misconduct complained of, but it earnestly insists that any error committed is not of a reversible nature. As the case is to be reversed, there seems no occasion for us to make a determination in this respect. We shall merely express the opinion that some of the argument complained of was highly improper and that, taken in connection with the misuse of the Grand Jury testimony, heretofore discussed, would present a very serious obstacle to the affirmance of the judgment."

I shall not quote those portions of the address which are quoted or summarized in the opinion of the court. It will suffice to make added reference to several portions.

One of the most reprehensible things a prosecutor can do is to attempt to put into evidence before the jury his own, and his colleagues', opinion as to the guilt of the defendants he is prosecuting. Such a practice brings before the jury the unsworn testimony of a sworn officer of the Government. This fact lends it undue and improper weight and injects an element into the case which is so insidious and so impossible to counteract that trial judges, in my experience, have never hesitated to withdraw a juror and declare a mistrial because of this violation of the canons.

In the closing address counsel said to the jury:

"Now, if anybody doubts, if anybody has the least shadow of a doubt about the fact that these men [referring to Government counsel] believe to the bottom of their hearts in the justice of the cause that they espouse here, I can disabuse their minds of that doubt at any time. They have been aggressive, and they have been forceful; their movements here have been intelligent, well-timed; and, as I said, they have come into this court room morning after morning, worn and tired almost to the breaking point. And it seemed to me that, I some times got the feeling, coming as they did then before you

to present this evidence and this case, they were something like the Crusaders of old, saying 'God wills it, God wills it.'"

Objection was not made by counsel for the defendants at the time of this statement but when a somewhat similar statement was made a few moments later objection was noted and exception taken. I think, however, that the offense was so flagrant that the court itself should have intervened irrespective of any objection.

A little later these statements occurred:

"Now, just between yourselves, do you honestly think that these boys here (indicating counsel at government table) fired with the enthusiasm of crusaders, as I say, and having given to this case every ounce of mental and physical strength they have, and I myself have contributed, also, would be trying to convict these men unless that was the wish and the desire of the highest officials in the government of the United States?"

After objection and exception counsel continued as follows:

"Now, just what do you think about it? Do you think these are three or four or five of these young fellows, as they have been calling them, just starting out on their own, running hog-wild? These are important men. I presume you all know they are engaged in a very important business, a business, the operation of which is almost a necessity in this country today. You don't think the government of the United States would allow four or five lawyers to come out here and prosecute this case against them, against their wishes, or that the Secretary of the Department of the Interior would allow us to do it, if he didn't want it done? And if he wanted it done it was because he believed, as did the other men in Washington, that there was a violation of law here, so outstanding and so withering and far-reaching in its effect that something ought to be done to stop it; and by that to tell the people

of this country that you can't do these things and get away with it."

Again there was objection and exception.

Counsel did not confine himself to testimony as to the prosecutors' belief in the defendants' guilt but, in attacking the credibility of an important witness for defendants, essayed to contradict that testimony by a statement of counsel's own knowledge of facts. The quotation from the address will make the matter clear:

"I want to refer in a moment to something that made an impression on me.

"You know, we lawyers have to depend—most of us are kind of tough guys. We have our own way of talking about witnesses. And one thing that we very often say and talk about is the three classes of liars. There is the plain liar, the damn liar, and the expert witness. And of all of them, the expert witness is the worst.

"There were a few of them here. There was Swensrud, the representative of the Standard of Ohio; there was Van Covern, and I think there was another one.

"But I just didn't think much of Swensrud's whole testimony, especially after I found out that he was giving testimony that they could ship gasoline in 1935 and 1936 up the Mississippi River to St. Paul. I happen to be around the Mississippi River quite a little, and know quite a lot about it. In 1935 and 1936, you couldn't get a rowboat up the Mississippi River, north of Winona—because the Government was putting in these dams for the purpose of creating the nine-foot channel that you have read so much about. They had concrete clear across the river, spaced in so many ways, that, as I say, you just couldn't get a rowboat up there. When Swensrud talked about gasoline going up that river, where I knew, because I lived there and was around there, that it couldn't be done, I just thought——."

After objection and a request that the court direct the jury to disregard the statement the court ruled:

"The jury may disregard it. I didn't hear it. I was thinking about something else."

Thereupon counsel resumed as follows:

"Now, if you will let me alone a few minutes, I will be through. If you don't, like 'Old Man River,' I will just keep rolling along. I don't want to do that.

"Now I was referring to these witnesses who knew so much. There was Van Covern, Swensrud, and a fellow named J. D. Miller. He was the fellow who never looked at anybody, so you could catch his eye. They knew so much, in the way they were telling it to you, that it is impossible, just impossible to believe that they could know as much as they said they did about it. They just covered too much territory. I think all history, sacred and profane, gives us but one single example of a person who knew everything—and he was not only a man, but he was God. And He gave up His life in a shameful death, upon the cross, between two thieves."

. . . . .

It is true that no formal exception was taken but the matter was highly prejudicial. The court should have dealt with it in some definite and positive way, which he omitted to do.

Considering what is set out in the opinion of this court, and the additional references I have made to the address, I am of opinion that counsel's argument was highly improper, as indeed the Government admits, and, further, that it was highly prejudicial. I do not think the court took proper means to counteract the impropriety and prejudice thus created and I think the only remedy available is to set aside a verdict ensuing upon such misconduct. Compare *Berger* v. *United States*, 295 U. S. 78, 85, 88, 89.

MR. JUSTICE MCREYNOLDS concurs in this opinion.